Philadelphia Suburban Transportation Company v. Public Utility Commission and Philadelphia Electric Company.

Argued June 3, 1971, before President Judge Bow-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*David Berger*, with him *H. Laddie Montague, Jr.*, for appellant.

*Herbert E. Squires*, Assistant Counsel, with him *Edward Munce*, Acting Counsel, for appellee, Pennsylvania Public Utility Commission.

*Frederic L. Ballard*, with him *Tyson W. Coughlin*, *Kenneth J. Levin* and *Edward G. Bauer, Jr.*, for intervenor, Philadelphia Electric Company.

OPINION BY JUDGE KRAMER, September 7, 1971:

This is an appeal from an order of the Pennsylvania Public Utility Commission (PUC) dated November 23, 1970, dismissing a complaint filed by the appellant, the Philadelphia Suburban Transportation Company (PST) against the Philadelphia Electric Company (PE), intervening appellee, alleging discrimination and preferential electric rates among customers to the detriment of PST. The complaint, as later twice amended, requested the PUC to fix, determine

and prescribe a special rate schedule for PST, together with refunds for any unlawful collection of rates by PE from PST. The thrust of PST's complaint is that because PE had established a rate schedule designed for the Philadelphia Transportation Company (PTC) arising out of a 1929 contract, and had continued to charge PTC for electric service under what was referred to in the record of this case as "Former Rate T" while "arbitrarily" not making that same rate schedule available to PST (PTC and PST both being street railway mass transit companies serving the Philadelphia area) resulted in the alleged discrimination and preferential treatment.

Because both PTC and PST, in 1968 and 1970 respectively, had all of their assets acquired by the Southeastern Pennsylvania Transportation Association (SEPTA), a mass transit municipal authority, the practical intent of the owners of the stock (or what remains of the assets) of PST is to claim refunds for those electric rate sums of money which PST alleges were overcharged to it by virtue of the alleged discrimination and preferential treatment. To understand what the PUC (which becomes the appellee on appeal) determined in its adjudication dismissing the complaint of PST, it will be necessary to set forth certain pertinent factual background and a description of the various rate schedules involved.

PTC was a mass transit railway public utility. On October 1, 1929, PE and PTC (formerly known as Philadelphia Rapid Transit Company) entered into an agreement whereby PTC agreed to cease generating its own electricity and to purchase its *entire* electric requirements from PE. Under the contract, PTC's electric generating facilities were leased to PE. In return for PE investing in, and providing facilities to supply the entire requirements of PTC, the railway company

agreed to pay for the electric service rendered under certain guarantees provided for in a three-part rate schedule. For purposes of this opinion, this rate schedule, which was designated Rate T, will be referred to herein as Former Rate T, because the three-part design of the rate schedule continued to June 16, 1966, when a new Rate T became effective. This new Rate T which continued after June 16, 1966, will be designated herein as "Current Rate T".

The three parts in the design of Former Rate T were: (1) The *capacity charge* was intended to recover the fixed costs on PE's investment in facilities to serve any customers taking electric service under Former Rate T. It contained a minimum billing demand provision under a formula which required PTC to pay the capacity charge (expressed in money) based upon 64,880.4 kilowatts regardless of its actual demands during the month. (2) The *energy charge* was designed to recover PE's operating costs at a designated sum of money per kilowatt hour for serving the electric energy to the customers taking service under Former Rate T. (3) The third part was a *transmission and distribution investment charge* (T & D charge), which was designed to recover for PE, on an annual basis, an amount equal to 13½ per cent of all of the investments which PE made in facilities required exclusively for service to PTC. Although written in terms of availability to anyone, there can be no question that Former Rate T was intended for only one customer, namely, PTC.

In 1936, PST was organized and became a customer of PE. PST was also a mass transit railway public utility. Its requirements for electric service were only one-tenth that of PTC. Although service to both PTC and PST was to be used for the same kind of customer with similar load factors and peak requirements, PST, because of its requirements, was not able to qualify for

service under the Former Rate T. PST did qualify to take its electric service under Rate HT, a high tension rate schedule for customers receiving energy at 13,000 volts and above. (The only exceptions to this statement of fact were three railroad and railway companies which, because of special circumstances were billed under special tariff classifications.) Rate Schedule HT is a two-part rate schedule with capacity and energy charges blocked in such a way that the larger the customer, the higher the demand, and the better the load factor, the lower unit price per kilowatt hour.

During the years involved, all of the rate schedules mentioned in this opinion were properly filed, approved by the PUC, and made a matter of public record. After about 29 years of service under Rate Schedule HT, PST filed (on March 11, 1965) the original complaint against PE alleging that PE had improperly and arbitrarily excluded PST from the use of Former Rate T. In the complaint, PST demanded to be permitted to utilize Former Rate T. The record indicates that PE thereafter offered to charge PST for electric service under Former Rate T, but by virtue of the calculations made in applying PST's receipt of energy to the Former Rate T formula (described above) PST realized that its monthly bill for electricity would be higher than had been charged under Rate Schedule HT. Therefore, on May 11, 1965, PST amended its complaint in which it alleged that the high billing demand, which was appropriate for PTC, made Former Rate T unavailable to PST and that therefore the rate schedule was discriminatory. Later, PE filed a supplement to its Rate T which became effective June 16, 1966, in which the rate schedule was changed from a three-part rate to a two-part rate. This Current Rate T had blocked capacity and energy charges and completely eliminated the T & D charge found in Former Rate T.

Current Rate T was designed to recover in the capacity charge all of those charges which formerly had been recovered in the T & D charge. Under Current Rate T, PST still did not qualify for service under Rate T, and therefore PST on June 15, 1967, filed a second amended complaint still alleging discrimination by virtue of the minimum billing demand requirement, but adding further that the T & D charge of the Former Rate T was likewise discriminatory against PST. In effect, PST was requesting the PUC to permit PST to take electric energy service under Former Rate T and Current Rate T without two of the major provisions or parts of Former Rate T and without the minimum billing demand of Current Rate T.

In its adjudication the PUC found that the separate classification of PTC under Former Rate T was proper, that the provisions of Rate T were appropriate for the special requirements of PTC, and that Rate HT as applied to PST yielded no more than a lawful return. It found further that PST was not in competition with PTC, that PST did not qualify under terms and conditions of the Former Rate T, and that PST paid no more than a reasonable rate of return for the service rendered to it under Rate HT. The PUC in its adjudication concluded that the service rendered to PTC and PST under the various rate schedules was not discriminatory nor was it preferential and that consequently PST was not entitled to any refund.

In a recent opinion of this Court in the case of *York v. Pennsylvania PUC*, 3 Pa. Commonwealth Ct. 270, this Court set forth its scope of review in appeals from adjudications of the PUC. We said there:

"Section 1107 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 P.S. 1437, provides: '. . . The order of the Commission shall not be vacated or set aside either in whole or in part, except

for error of law or lack of evidence to support the finding, determination, or order of the Commission, or violation of constitutional rights. . . .' Section 1112 of the same Act, 66 P.S. 1442, provides: 'Whenever the Commission shall make any rule, regulation, finding, determination, or order under the provisions of this Act, the same shall be prima facie evidence of the facts found. . . .'

"Our authority to overrule an order of the Commission is limited. We may not disturb such an order except for errors of law, lack of evidence to support a finding, determination or order of the Commission, or a violation of constitutional rights. Clemmer v. Pennsylvania Public Utility Commission, 207 Pa. Superior Court, 388, 217 A. 2d 800 (1966). Likewise, we may not exercise our independent judgment on the record or resolve conflicting evidence. Pittsburgh Railways Company v. Pennsylvania Public Utility Commission, 198 Pa. Superior Court, 415, 182 A. 2d 80 (1962). Our inquiry is directed to whether there is substantial evidence to support the Commission's action. Pittsburgh and Lake Erie Railroad Company v. Pennsylvania Public Utility Commission, 170 Pa. Superior Court, 411, 85 A. 2d 646 (1952). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Pennsylvania State Board of Medical Education and Licensure v. Schireson, 360 Pa. 129, 61 A. 2d 343 (1948). Substantial evidence has also been said to mean evidence affording a substantial basis of fact from which a fact in issue can reasonably be inferred. Substantial evidence is synonymous with competent and relevant evidence having a rational probative force. In Philadelphia Suburban Water Company v. Pennsylvania Public Utility Commission, 425 Pa. 501, 229 A. 2d 748 (1967), it was held that in view of Section 1107 of the Public

Utility Law of 1937, the Pennsylvania Public Utility Commission's exercise of its discretion must be accepted by the courts unless its action is totally without support in the record, or is based on an error of law or is unconstitutional." We again hold that these statements describe our scope of review of PUC adjudications.

The relevant provisions of the Public Utility Law, *supra*, with respect to rates and rate making are to be found in Article III of the Act. They are Section 301 (66 P.S. 1141) which provides that every rate shall be just and reasonable; Section 304 (66 P.S. 1144) which prohibits unreasonable preferences, while permitting reasonable classification; Sections 309 and 310 (66 P.S. 1149 and 1150) which permit the Commission to fix permanent or temporary rates if it finds that existing rates are unjust or unreasonable or unlawful; and Section 313 (66 P.S. 1153) which authorizes the Commission to order a refund to a complainant if it finds that the rates paid by the complainant were unjust or unreasonable or in violation of the Commission's orders or rules, or if it finds that the rate paid by the complainant was in excess of the applicable rate contained in an existing and effective tariff.

Section 304, *supra*, states: "No public utility shall, as to rates, make or grant any *unreasonable preference or advantage* to any person, corporation, or municipal corporation, or subject any person, corporation or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any *unreasonable difference* as to rates, either as between localities or as between classes of service. Unless specially authorized by the commission, no public utility shall make, demand, or receive any greater rate in the aggregate for the transportation of passengers or property of the same class, or for the transmission

of any message or conversation for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or any greater rate as a through rate than the aggregate of the intermediate rates. *Nothing herein contained shall be deemed to prohibit the establishment of reasonable zone or group systems, or classifications of rates* or, in the case of common-carriers, the issuance of excursion, commutation, or other special tickets at special rates, or the granting of nontransferable free passes, or passes at a discount to any officer, employe, or pensioner of such common carrier. No rate charged by a municipality for any public utility service rendered or furnished beyond its corporate limits shall be considered unjustly, discriminatory solely by reason of the fact that a different rate is charged for a similar service within its corporate limits." (Emphasis added) We conclude that under Section 304, so long as the classification of customers is reasonable or is founded upon some reasonable basis, a utility may charge different rates for different classes of customers. The question of whether the classification utilized by the utility is reasonable is a question of fact to be determined by the finder of the fact, namely the PUC. See *Deitch Co. et al. v. Pennsylvania PUC*, 204 Pa. Superior Ct. 102, 203 A. 2d 515 (1964). The leading case on classification is *Alpha Portland Cement Company v. Public Service Commission*, 84 Pa. Superior Ct. 255 (1925).* The Pennsylvania Superior Court there held that the preference to one class of customers was not unreasonable unless it could be proven that it created a prejudice to other customers. The PUC found no such prejudice in this case, and we cannot discern any abuse of discretion in that finding.

---

* Although this opinion was applicable to a former statute regulating public utilities, the principles of law remain the same.

Our Pennsylvania Superior Court in the case of *Carpenter v. Pennsylvania Public Utility Commission*, 141 Pa. Superior Ct. 447, 450, 15 A. 2d 473, 474 (1940), in a case involving electric utility rates, succinctly set forth the applicable law on the subject of discrimination and unreasonable preferences. It said: "Both at common law and under our statutes, the discrimination forbidden is one that is unreasonable and without factual basis. Alpha Portland Cement Company v. Public Service Commission, 84 Pa. Superior Ct. 255, 270. In that case, Gawthrop, J., speaking of similar provisions in prior statutes said at page 272 [of 84 Pa. Super.]: '[The Act] contains no requirement that rates for different classes of service be either uniform or equal, or even equally profitable to the utility. The requirement is merely that rates for one class of service shall not be unreasonably prejudicial and disadvantageous to a patron in any other class of service. Before a rate can be declared unduly preferential and therefore unlawful, it is essential that there be not only an advantage to one, but a resulting injury to another. Such an injury may arise from collecting from one more than a reasonable rate to him in order to make up for inadequate rates charged to another, or because of a lower rate to one of two patrons who are competitors in business. There must be an advantage to one at the expense of the other.' See to the same effect, American Lime and Stone Company v. Public Service Commission, 100 Pa. Superior Ct. 158, 161; Hunter v. Public Service Commission, 110 Pa. Superior Ct. 589, 595, 596, 168 A. 2d 540; Reading-Coach Company v. Public Service Commission, 125 Pa. Superior Ct. 493, 497, 190 A. 172; Pennsylvania R.R. Company v. Public Utility Commission, 135 Pa. Superior Ct. 5, 18, 4 A. 2d 622." And later in the same case, the Superior Court added, at page 452 of the official reports and at page 475, A. 2d:

"Under these findings our review is limited to a determination of whether or not there is in the record competent and substantial evidence to support the commission's findings. . . In so far as the reasonableness of the classification of service here involved, and of the differences between the rates in the respective classes, is an administrative or factual question, we cannot disturb the commission's findings thereon, if supported by competent evidence. (Citing cases)" We believe this to be sound law on the subject and controlling in this case. See *Deitch Company, et al. v. Pennsylvania PUC, supra,* where again the Superior Court said, at pages 109-10 Pa. and at page 519, A. 2d:

"This section of the statute [Section 304] like its predecessor, does not forbid reasonable classification of service or rates, and what is reasonable under the circumstances is primarily an administrative question for the Commission to decide. . . .

"The question of the reasonableness of rates and the difference between rates in their respective classes is an administrative or factual question wherein the findings of the Commission, if supported by competent evidence, will not be disturbed. . . .

"The function of this court on appeal is to determine whether there is error of law or lack of evidence to support the finding, determination, or order of the Commission. [Citing cases] On this record the Commission could properly find that the complainants had not sustained their *burden of proof* to show that the rates attacked were unreasonable or discriminatory. We may not substitute our judgment for that of the Commission on the reasonableness of the rate prescribed." (Emphasis added)

In this case, the regulatory agency had, from the inception of the agreement between PTC and PE in 1929, approved the Former Rate T schedule as a proper cus-

tomer classification in the tariff of PE. The record in this case is filled with supporting competent evidence upon which the Commission could determine that not only was the classification reasonable, but that the cost of service resulting from electric service under the Former Rate T had always produced earnings for PE, even though the return was lower than that return which would have been allowed by the Commission under a finding of a fair rate of return. It is important to note that the rate of return to PE for service to PST, although higher than that for PTC, was likewise less than the rate of return which PE was permitted to have.*

It is of no import that PST could not avail itself of Former Rate T, because it could not meet the minimum billing demand. As described hereinbefore, the minimum billing demand was designed for the purpose of permitting PE to recover certain of its fixed costs required to serve PTC. It would have been improper for the PUC to have reduced the minimum billing demand or eliminated it for the purpose of permitting PST to then take advantage of the lower energy charge, for that would have relieved PTC from its responsibility of paying for certain of the fixed costs incurred by PE for PTC and in all probability would have placed such unrecovered costs upon all other customers. The record clearly shows that PTC, on occasion, did not take sufficient quantities of electric energy to meet the

---

* The record sets forth the Rate of Return on Net Plant and Working Capital for both PST and PTC under the rate schedules under which they took service for the years 1960 through 1964 as follows:

|       | PST  | PTC  |
|-------|------|------|
| 1960  | 4.10 | 2.72 |
| 1961  | 4.58 | 2.76 |
| 1962  | 4.89 | 3.29 |
| 1963  | 4.29 | 3.21 |
| 1964  | 5.36 | 3.82 |

minimum billing demand, and thereby was made to pay more under the capacity charge provisions of Former Rate T than its actual monthly demand for electric energy. It likewise would have been error for the PUC to have eliminated the T. & D. charge of Former Rate T solely for the purposes of PST. The approach of PST in this regard is unreasonable, for it is well established that any change in any revenue-producing portion of any rate schedule makes necessary the redesigning of such an altered rate schedule, or even other rate schedules, including the alteration of the level of the money charges for the unit of service or commodity supplied by the utility. Nowhere in the record of this case did PST offer a cost of service or any supporting data to compensate for the changes it demanded in Former Rate T. In this regard PST failed to meet its burden of proof entirely. In the recently reported PUC case, *Pennsylvania PUC, City of Reading, et al. v. Metropolitan Edison Company,* 44 Pa. P.U.C. 709, 750-51 (1970), the Commission stated:

"The Public Utility Law provides that every rate made, demanded or received by any public utility shall be just and reasonable, and that there may be no unreasonable preference or prejudice to any customer. However, there can be no question but that a public utility company may establish reasonable customer groupings or classifications for rates. Section 301 of the Public Utility Law, Act of 1937, P. L. 1053, as amended (66 P.S. §1143) expressly provides: '. . . Nothing herein contained shall be deemed to prohibit the establishment of reasonable zones or group systems or classifications of rates. . . .'

"There is no requirement that rates for different classes of service must be either uniform or equal or that they must be equally profitable. Differences in rates between classes of customers based on such cri-

teria as the quantity of electricity used, the nature of the use, the time of the use, the pattern of the use, or based on differences of conditions of service, or cost of service are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation. Rate structure, which is an essential, integral component of rate-making, is not merely a mathematical exercise applying theoretical principles. Rate structure must be based on the hard economic facts of life and a complete and thorough knowledge and understanding of all the facts and circumstances which affect rates and services; and the rates must be designed to furnish the most efficient and satisfactory service at the lowest reasonable price for the greatest number of customers, i.e., the public generally. Since each public utility has different problems of supply, production, distribution, competition, geographic conditions, etc., there need be and there can be no absolute equality and uniformity of rates between utilities or between classes of service within the same utility." We hold that that statement by the PUC is a proper description of the applicable principles pertaining to this case.

PST attempts to make a point that there was preferential treatment to PTC by virtue of the fact that the PUC permitted PE to combine the meter readings of the twenty-five different PTC delivery points throughout its system, which permitted PTC thereby to take advantage of the minimum monthly billing demand. It is interesting to note that PST does not find fault with combined billing, *per se,* for the obvious reason that PST found it advantageous to have combined billing for its three delivery points. In all of the cases cited by PST on this point, there are distinguishing facts. The cases say that where a utility permits combined billing to a customer for separate buildings or separate

plants, combined billing is not proper. Here, however, the transit system of PTC extends over a large metropolitan area. The record is not clear whether or not it would be even feasible or possible for PE to deliver all of the energy to PTC at one delivery point, or whether this came about as a result of PTC foregoing its rights to produce some of its own energy and thereby contractually binding itself to take its entire supply of energy from PE. Once again, PST failed to meet its burden of proof.

PST also attempted to show a preferential treatment by virtue of the fact that some of the energy received by PTC was at a 25-cycle service, whereas all other service by PE's customers was received at a 60-cycle service. Nowhere in the record did PST prove that this differential in cost of rendering 25-cycle service was not included in Former Rate T schedule. It is also interesting to note that PST's expert witness admitted that certain of the facilities and service received by PST were more expensive to PE than its service to PTC. For instance, PST's expert witness pointed out that some of the service to PTC was supplied without any transformation, which would tend to make such deliveries less expensive than deliveries to PST.

To carry PST's argument to its logical conclusion, any customer, even a residential customer, whose load factor and peak periods would be comparable to PST's, could make out a case for a separate rate schedule thereby eliminating the blocked capacity charges of the HT Rate schedule under which PST takes its electric service, and thereby attempt to prove that its electric bills are excessive and discriminatory. This would create utter chaos in the utility rate-making process.

Although it is of no controlling effect in this case, the Commission noted, and we likewise take notice, that

although Former Rate T was a matter of public record, PST made no complaint during the almost thirty years that it took electric service from PE, before PST filed its complaint in this case. Merely because PST waited so long does not mean that, if it could prove discrimination or preferential treatment in this case, it would not have been entitled to demand a refund for the two-year statutory period (Section 313, 66 P.S. 1153). This fact does permit an inference, however, that PST was satisfied with the classification of customers and service under PE's tariff until at least 1965. We likewise take note of the manner in which PST amended its complaint twice in this case, thereby evidencing an intent to seize upon anything remotely available to support a claim for refunds. It is apparent that when the original complaint was filed, PST believed it could lower its electric bills under Former Rate T; but when it developed that the minimum billing demand (which at times cost even PTC additional monies for electricity not taken) would increase the electric bills of PST, it had to amend its complaint to attempt to eliminate those provisions of the Former Rate T rate schedule which had been designed to recover costs and produce a return.

We hold that there is more than adequate substantial evidence in the record of this case to conclude that the PUC did not abuse its discretion or commit an error of law. In view of this holding, it is not necessary for us to rule on the question of refunds. The Order of the PUC is hereby affirmed.

Judge MANDERINO dissents.