Lower Paxton Township, Appellant, *v.* Common-
wealth of Pennsylvania, Pennsylvania Public
Utility Commission, Appellee, and Dauphin Con-
solidated Water Supply Company, Intervening
Appellee.

136

Argued December 5, 1973, before Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. President Judge BOWMAN did not participate.

*Richard H. Wix*, with him *Wix & Wenger*, for appellant.

*Larry Gesoff*, Assistant Counsel, with him *Philip P. Kalodner*, counsel, for appellee.

*W. Russel Hoerner*, with him *Shearer, Mette, Hoerner & Woodside*, for intervening appellee.

OPINION BY JUDGE KRAMER, April 17, 1974:

This is an appeal by Lower Paxton Township (Township) from an order dated March 20, 1973 of the

Pennsylvania Public Utility Commission (PUC) wherein the complaints of the Township and one consumer complainant, George W. Smith (Smith), were dismissed, and the inquiry and investigation of the PUC into the increased rate application of Dauphin Consolidated Water Supply Company (Dauphin) was terminated.

This case had its beginning on June 29, 1971 when Dauphin filed a revised tariff providing for rate changes in existing metered rates calculated to produce increased additional annual revenues in the amount of $1,136,985 (approximately a 103 percent increase) exclusive of an item termed "State tax adjustment surcharge." Dauphin is in the public utility business of supplying water to 14,873 customers, 92.8 percent of which are residential customers, in approximately 16 municipalities located in three counties. Ten formal complaints were filed, nine by municipalities and one by Smith.

On August 30, 1971, the PUC suspended the effective date of the proposed new tariff for six months (to March 1, 1972). In accordance with its rules, the PUC held prehearing conferences which resulted in Dauphin agreeing to reduce the proposed annual increase in rates to a total of $664,076 (a 59.9 percent increase), provided the rates necessary to produce the reduced proposed increase be made effective without further delay. On January 10, 1972, the Commission issued an order which permitted Dauphin to file an amendment or supplement to its tariff, which would produce the 59.9 percent annual increase in revenues, to become effective on five days' notice. As a result of these negotiations and the order of January 10, 1972, eight of the ten complainants withdrew their complaints, leaving only the complaints of Lower Paxton Township and Smith. These new rates went into effect on January 17, 1972. In view of the fact that not all

of the complainants were willing to withdraw their complaints as a result of this development, the Commission ordered hearings and investigations to proceed on the amended or supplemental tariff provisions.

The PUC held six days of hearings through May 1, 1972, at which the PUC received evidence in support of and in opposition to the proposed and amended new rates. Oral argument was held on July 12, 1972, and on March 20, 1973, the PUC issued its long form order in which it exhaustively covered the many issues presented and ultimately approved the rates filed pursuant to its January 10, 1972 order. Both the Township and Smith appealed to this Court. Smith's appeal, however, was quashed by an order of this Court as having been improperly filed, and his petition to intervene also was denied.

Although the Township filed a dozen assignments of error, it has presented three basic issues: (1) Did the P.U.C. err in approving this rate increase which the Township alleges to be in violation of the guidelines established by the Federal Price Commission? (2) Did the Commission err in considering the capital structure of General Waterworks Corporation (GWC) instead of the capital structure of International Utility Corporation (IUC)? (3) Did the Commission err in its determination of the cost of capital for Dauphin?

In at least three recent cases, this Court has set forth its scope of review on appeals from orders of the PUC. *See Western Pennsylvania Water Company v. Pennsylvania Public Utility Commission,* 10 Pa. Commonwealth Ct. 533, 311 A. 2d 370 (1973) ; *Pennsylvania Power and Light Company v. Pennsylvania Public Utility Commission,* 10 Pa. Commonwealth Ct. 328, 311 A. 2d 151 (1973) ; and *Tranter v. P.U.C.,* 4 Pa. Commonwealth Ct. 585, 288 A. 2d 837 (1972). In all of those cases we referred to Section 1107 of the Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended,

66 P.S. 1437, which provides in pertinent part: "The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination , or order of the commission, or violation of constitutional rights." *See Clemmer v. Pennsylvania Public Utility Commission,* 207 Pa. Superior Ct. 388, 393, 217 A. 2d 800, 804 (1966). In *Johnstown-Pittsburgh Express, Inc. v. Public Utility Commission,* 5 Pa. Commonwealth Ct. 521, 291 A. 2d 545 (1972), we held this section of the law to mean that the appellate courts cannot conceive an independent judgment from the record and substitute it for the judgment of the PUC. We may not indulge in the process of weighing evidence and resolving conflicts in testimony. As our Supreme Court stated in *Philadelphia Suburban Water Company v. Pennsylvania Public Utility Commission,* 425 Pa. 501, 229 A. 2d 748 (1967), the PUC's discretion must be accepted unless totally without support in the record, based on error of law, or is otherwise unconstitutional. *See Also Philadelphia Suburban Transportation Company v. Public Utility Commission,* 3 Pa. Commonwealth Ct. 184, 281 A. 2d 179 (1971).

We can dispose of the Township's contention concerning the guidelines established by the Federal Price Commission for public utility rates by reference to the federal act itself. The Economic Stabilization Act of 1970 (P. L. 91-379, 84 Stat. 779, as amended, 12 U.S. C.A. §1904 note), in Section 211, clearly states that "[t]he district courts of the United States shall have exclusive original jurisdiction of cases or controversies arising under this title, or under regulations or orders issued thereunder, notwithstanding the amount in controversy. . . ." In another recent case, *Rankin v. Chester-Upland School District,* 11 Pa. Commonwealth Ct. 232, 312 A. 2d 605 (1973), we held that this Court has no jurisdiction to pass upon whether prices or wages

violate federal price and wage laws, rules, regulations or orders.

On the subject of the corporate capital structure used by the PUC (in its determination of cost of capital), it is first necessary to understand the corporate relationships involved. Dauphin is a wholly-owned subsidiary of GWC. GWC is a holding company, which in turn is a wholly-owned subsidiary of IUC (since March 1, 1968). Prior to 1968, GWC was a publicly-owned company, having water, sewage, heating, industrial, dairy and communications subsidiaries. After its acquisition by IUC, GWC was reorganized so that all of its operations, and that of its subsidiaries, were restricted to public utility businesses. As of July 22, 1971, GWC operated 71 water companies (eight of which also provided sewage service), one sewage company and eight heating companies. IUC is a holding company, the interests of which are varied, much of which is not related to public utility service. The record discloses that GWC carries out autonomously its own debt financing. GWC has been the source of capital contributions for Dauphin. The record also discloses that Dauphin has not paid dividends to GWC for a considerable period of time. Furthermore, funds affecting the capital structure of GWC or Dauphin do not flow from IUC. In summary, then, the record supports the PUC's conclusion that GWC provides its own financing.

As we delve into this subject, it is important to remember that, in this type of case, the ultimate aim of the PUC is to determine or fix public utility rates for service which are just and reasonable. (See Section 301 of the Public Utility Law, 66 P.S. §1141.) In addition, we note that a public utility is entitled to a fair return, based upon the fair value of its property used and useful in the public service. Historically, the PUC (with approval of the courts) has followed a statistical

rate-making formula under which all of the expenses allowable under the law, including depreciation, amortization and taxes are determined, which, when added to the return, total the allowable operating revenues of a public utility. In this Commonwealth the return is determined by a percentage figure called a "rate of return" multiplied by the fair value of the public utility's property devoted to the public service. In determining a fair rate of return, the PUC gives consideration to a number of factors. It must determine whether the company's actual experience is fair and reasonable to both the utility and the customer, and whether the proven future operations should also be considered. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 126 A. 2d 777 (1956). The rate of return should produce a return sufficient to assure continued adequate service and confidence in the financial integrity of the public utility so as to maintain its credit and permit it to attract capital. Another acceptable consideration in arriving at a basis for determining the fair rate of return is known as the "cost of capital." This is a percentage figure of the cost a public utility would be obliged to pay to obtain debt and equity capital. *See Pittsburgh v. Pennsylvania Public Utility Commission, supra.* The cost of capital study should give consideration to the utility's financial structure, credit standing, dividends, interests, risks, regulatory lag, wasting assets and any peculiar features of the utility involved. *See Riverton Consolidated Water Company v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 1, 140 A. 2d 114 (1958). Because of these many variables, the cost of capital is basically a matter of judgment governed by the evidence presented and the regulatory agency's expertise. Although the cost of capital (represented by a percentage figure) does not control what is a fair rate of return, it is certainly one

of the most important bases upon which a fair rate of return is determined.

The capital structure of a corporation may affect, sometimes drastically, the cost of capital. The capital structure is, in reality, little more than those dollars represented by its common and preferred stock and its debt. In some cases where the public utility is a wholly-owned subsidiary, its capital structure may not be comparable to another public utility which is obliged to obtain its equity and debt financing in the open market. In other words, it may have on balance a too heavily weighted debt or equity. In this case the record discloses that Dauphin has a capital structure wherein 100 percent is equity capital. Under such circumstances the PUC must make adjustments based upon substantial evidence in order to reach a fair result. *See Riverton, supra; Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 551, 128 A. 2d 372 (1956); and *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 126 A. 2d 777 (1956). In such cases our Superior Court has approved PUC adjustments, whereby the capital structure and cost of capital of the parent company were utilized in determining the same for the subsidiary. It is also conceivable that there may be evidence on the record which will permit the PUC to utilize the capital structure and cost of capital statistics of comparable public utilities instead of those of the company or its parent. *See Wall v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 35, 125 A. 2d 630 (1956). In any event, we are instructed by precedent that where the findings of the PUC relative to cost of capital are within "the scope of the evidence" its findings will not be disturbed. *See Riverton, supra.*

In this case Dauphin presented evidence in support of an adjusted capital structure of 50 percent debt and 50 percent equity. This was based upon a five-year

study of the capital structure of GWC. Dauphin's witness stated that it was the company policy of GWC not to exceed a 55 percent debt in its capital structure. The PUC concluded that it believed that a capital structure of 55 percent debt and 45 percent equity was the "most probable and practical for use in these proceedings." Our careful review of the record in this case permits us to conclude that there is substantial evidence in the record to support the PUC's findings and conclusion that a reasonable capital structure for Dauphin for rate-making purposes should be 55 percent debt and 45 percent common equity. Contrary to the contention of the Township, the capital structure of IUC, which consists of 62.5 percent debt, 10 percent preferred and 27.5 percent common equity, may not be appropriate necessarily for Dauphin, especially since IUC does not supply Dauphin's financing, and its operations are much more varied than that of a company restricted to public utility water service. The capital structure of a public utility is a determination representing a judgment figure which should be left to the regulatory agency and which should not be disturbed except for a manifest abuse of discretion. This record does not disclose such an abuse of discretion.

Lastly, the Township contends that the PUC erred in determining the cost of capital for Dauphin, and, in its brief, restricted its argument to the determination of the cost of equity capital. Although it is difficult to discern from the Township's brief the exact nature of its complaint, it would appear that the Township contends that it was error for the PUC not to utilize the cost of equity capital to IUC in arriving at the cost of equity capital for Dauphin. *Riverton, supra,* gives us some guidance wherein the court held that the cost of capital should be based upon evidence of the company's recent past experience in order to obtain the cost of debt and equity capital in the future. The cost

of equity determination usually gives consideration to such matters as the demands for the use of money, the growth in earnings expected by the investor, earnings-price ratios, dividend yields, the marketing cost associated with raising common equity capital and the earnings of comparable companies with similar risks. Once again we note that there is no magical formula; it's a matter of judgment based upon the record presented. The record in this case discloses that Dauphin does not publicly trade common equity and further does not issue its own debt. Rather, all of its financing comes from its parent, GWC. The record clearly discloses that none of its financing comes directly from or through IUC. The PUC went into great detail in its adjudication on why it used evidence concerning the cost of equity capital of comparable public utility water companies traded on the public market with appropriate adjustments to earnings-price ratios. IUC's substantial non-utility interests certainly support the PUC's refusal to use solely IUC's cost of equity in determining Dauphin's cost of equity. In view of the fact found in the record that Dauphin paid no dividends, it was certainly reasonable for the PUC to give great weight to the equity cost experience of other public utility water companies (similar to GWC), whose common equity is publicly traded. The use of other comparable companies was approved by the court in *Riverton, supra.* Our careful review of the record in this case permits us to conclude that there is substantial evidence in the record to support the PUC's findings and conclusions that the cost of common equity was "in the area of 9.5 percent."

Although not mentioned in the Township's brief, we add that the record likewise supports the PUC's determination that the cost of debt capital "would be in the range of 6.5-6.6 percent." The PUC's conclusion that the rate of return of 7.48 percent when ap-

plied to a fair value of $8,950,000 and resulting in an overall return of $669,216 was not excessive and is supported by the record made in this case. Therefore we affirm the order of the PUC.