**Blue Mountain Consolidated Water Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.**

Argued December 10, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., ROGERS, BLATT, CRAIG, MACPHAIL and WILLIAMS, JR. Judges MENCER and PALLADINO did not participate.

*Vincent Butler, Morgan, Lewis & Bockius,* for petitioner.

*John A. Levin,* Assistant Counsel, with him *Steven A. McClaren,* Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel, for respondent.

OPINION BY JUDGE ROGERS, March 6, 1981:

Blue Mountain Consolidated Water Company (Blue Mountain), a public utility providing water service to about 6500 customers in Northampton County, has appealed from an order of the Pennsylvania Public Utility Commission allowing it an increase in annual operating revenues of $10,675, an amount $249,187 less than that requested.

On October 27, 1978, Blue Mountain filed supplement No. 21 to Tariff Water-Pa. P.U.C. No. 9 which proposed to increase operating revenues from $905,057 to $1,164,919 exclusive of the revenues derived from the State Tax Adjustment Surcharge. By order dated January 11, 1979, the Commission offered Blue Mountain as an alternative to an investigation of the proposed rates, the option of filing a new tariff supplement designed to produce an increase in annual operating revenues of $21,342. Blue Mountain declined this offer and the Commission suspended the proposed rates and instituted an investigation to determine their reasonableness. No complaints challenging Blue Mountain's proposed increase of rates were filed by any of its customers or by the Office of Consumer Advocate.

Following a pre-hearing conference and six days of hearings, Administrative Law Judge Edward R. Casey recommended that Blue Mountain be granted an increase of annual operating revenue of $120,666. Both Blue Mountain and the Commission's Trial Staff filed exceptions to the judge's recommendations.

Based on the record created before the Administrative Law Judge, the Commission determined, as noted, that an increase in operating revenues of only $10,675

was warranted. On the way to this decision, the Commission disallowed a portion of Blue Mountain's income tax expenses, amortized certain of Blue Mountain's other expenses over longer periods than those claimed by the utility, and approved a rate of return figure less than that to which Blue Mountain's expert witness testified. Blue Mountain, by Petition for Review, challenges these aspects of the Commission's decision. In addition, Blue Mountain contends that the Commission's decision was impermissibly premised, in part, on ex parte communications by a person on a Commissioner's staff with persons on the Commission Trial Staff, including Trial Staff's principal expert witness.

Our review is limited to a determination of whether constitutional rights have been violated, an error of law committed, or whether the findings, determinations or order of the Commission are supported by substantial evidence. *United States Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978).

### The Communications

Section 319 of the Public Utility Code, 66 Pa. C.S. §319, entitled Code of Ethics, provides in pertinent part that "[a] Commissioner . . . must . . . [a]void all ex parte communications prohibited in this part." Section 334(c) defines the prohibited ex parte communications as "any off-the-record communications to or by any member of the commission, administrative law judge, or employee of the commission, regarding the merits or any fact in issue of any matter pending before the commission in any contested on-the-record proceedings."

On October 1, 1979, the same date the Commission's order in this matter was entered, W. Wilson Goode, P.U.C.'s chairman, sent to Blue Mountain and

the Commission Trial Staff copies of a memorandum of a member of Chairman Goode's staff detailing conversations of the writer with two members of the Bureau of Rates, one of whom had testified for the Commission Staff in opposition to Blue Mountain's application. The memorandum, which is in the record, reveals that these conversations concerned the merits of Blue Mountain's rate proposal, a matter then pending before the Commission and, therefore, they were prohibited ex parte conversations within the meaning of Section 334 of the Public Utility Code.

At the outset, we note that Blue Mountain does not attack the Commission's decision as impermissibly based on this ex parte evidence in its Petition for Review filed October 23, 1979. Therefore, this issue, to which the parties have devoted a substantial portion of their briefs, is not properly before us. Moreover, it is clear from the whole record and the nature of the prohibited conversations that Chairman Goode's prompt notice of the occurrence with opportunity to Blue Mountain to respond removed the taint of prejudice. At oral argument before this Court counsel for Blue Mountain observed that a remand of this record for further consideration by the Commission on this ground alone would serve no purpose. We agree. Blue Mountain's counsel has nevertheless suggested that some of the Commission's allegedly erroneous decisions may have been the product of the improper communications.

### Income Tax Expense

Income tax is a component of Blue Mountain's operating expenses which must be offset by revenue. In determining the amount of this expense the Commission disallowed $32,918 in federal income tax actually paid by Blue Mountain, a figure calculated to reflect the additional interest deductions that would

have been available to Blue Mountain if the utility's capital structure were more like those of other members of the industry. Blue Mountain's capital structure was heavily weighted in the equity component and in the industry generally debt preponderates.[1]

We have held that income taxes actually paid by a utility must be allowed as an expense item unless the Commission finds that in abuse of its discretion, management has arranged the capital structure with the purpose and effect of imposing an unfair burden of tax expense on the regulated utility. *T. W. Phillips Gas & Oil Co. v. Pennsylvania Public Utility Commission*, 50 Pa. Commonwealth Ct. 217,    412 A.2d 1118, 1123 (1980); *Bell Telephone Company of Pennsylvania v. Pennsylvania Public Utility Commission*, 17 Pa. Commonwealth Ct. 333, 339, 331 A.2d 572, 575 (1975). As was the case in *T. W. Phillips Gas & Oil Co., supra*, the Commission here made no findings of managerial abuse and the assertions of unfairness and mismanagement contained in the Commission's brief are without substantial evidentiary support. Therefore, the record must be remanded for the purpose of calculating taxes to be allowed as expenses on the basis of Blue Mountain's actual interest expense.

### Amortization of Deferred Maintenance Expenses

Blue Mountain has been engaged since 1975 in a program of special maintenance including the clean-

---

[1] Blue Mountain's actual capital structure at the close of the test year was 22.5% debt and 77.5% common equity. The Commission utilized a hypothetical capital structure of 55% debt and 45% common equity. This hypothetical capital structure is supported by the data supplied by Blue Mountain concerning the capital structures of a barometer group of eight water utilities (55% debt, 8% preferred stock and 37% common equity). Blue Mountain's rate of return witness testified and the administrative law judge and the Commission found that the utility was too small to effectively utilize the issuance of preferred stock in its capitalization.

ing and repairing of water mains to improve the quality and reliability of the service to its subscribers. This program, as of the close of the test year has resulted in expenses of $176,118 which Blue Mountain proposed to amoritze over a five year period. The Commission found that $109,197 of these expenses have already been recovered by Blue Mountain as part of a rate settlement entered into by the Utility and the Commission in 1976. In the order now subject to review, the balance of $66,921 was amortized by the Commission over an additional five years at $13,384 per year. Blue Mountain does not dispute the Commission's finding that a portion of the maintenance expenses have already been recovered. Rather, it contends that the additional five year amortization period for expenses incurred, in part, as long ago as 1975 is unreasonable. We disagree. The period for the recovery of unusual capital expenses incurred primarily outside the test year is a determination peculiarly within the expertise and discretion of the Commission. When cross-examined on this issue the senior rate accountant of Citizens Utilities Company, Blue Mountain's corporate parent, testified as follows:

Q. Now, how did you determine five years was the proper amortization period?

A. Well, I'll repeat my previous answer. In my opinion, I think it's an equitable period of time for the ratepayer and for the investor to get the benefit of the service provided by that deferred maintenance.

I mean, this company made a very, very significant effort to improve the quality of service for its customers, and I think it's only fair that they should be rewarded—or not rewarded, but have the opportunity to earn fairly on this effort.

Q. Would six years be less appropriate?

A. Not any more so than four years.
Q. Seven years?
A. Three.
Q. You just chose—
A. I mean, you know, traditionally five years seems to be a number that most commissions use for extraordinary items. They also use ten years. I know many commissions that use three years, things like rate case expense.

### Amortization of Rate Case Expenses

Blue Mountain also challenges the Commission's order insofar as it assigns a useful life of five years to the utility's expenses incurred as a result of rate litigation. We cannot say that the Commission's determination is unreasonable and we are unpersuaded that the historical data introduced by Blue Mountain compels the use of a three year amortization period. *See Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 512, 530, 409 A.2d 446, 454 (1979).

### Rate of Return

A public utility is entitled to a fair return on the fair value of its property used and useful in the public service. *Lower Paxton Township v. Pennsylvania Public Utility Commission*, 13 Pa. Commonwealth Ct. 135, 317 A.2d 917 (1974). An important consideration in determining the fair rate of return is the utility's "cost of capital," a figure expressed as a percentage representing the cost that the utility would be obliged to pay to obtain new debt and equity capital. *Equitable Gas Co. v. Pennsylvania Public Utility Commission*, 45 Pa. Commonwealth Ct. 610, 405 A.2d 1055 (1979). Since the capital structure of a utility may affect its cost of obtaining capital and since the capital structure of a corporation, like Blue Mountain, wholly owned by another may not be similar to those

of public utilities obliged to obtain their debt and equity financing on the open market, the Commission may use the capital structure and cost of capital statistics of comparable public utilities as shown by substantial competent evidence in order to reach a fair result. Here, finding Blue Mountain's capital structure to be atypical because overweighted on the equity side the Commission employed a hypothetical structure of 55% debt and 45% equity. *Lower Paxton Township, supra* at 142, 317 A.2d at 921.

Here, the Commission found the fair annual rate of return to be 5.7% on the fair value of Blue Mountain's property devoted to public service. Despite our careful and repeated study of the Commission's decision, we have been unable to discover how the Commission arrived at this figure. The Commission determined that Blue Mountain's cost of debt and cost of common equity were 7% and 13.2%, respectively. Blue Mountain principally asserts that each of these figures is unreasonably low and unsupported on the record. Our difficulty with the Commission's 5.7% rate of return figure, however, is more fundamental. The Commission's cost of debt and equity figures applied to the hypothetical 55% debt, 45% equity capital structure yields a suggested rate of return of 9.79%.[2] Evidently the Commission then divided this figure by 1.716, the factor by which the original cost of Blue Mountain's properties ($2,557,193) must be multiplied to get the fair value figure ($4,387,774). This operation produces the 5.7% figure. While there

---

[2]

| | Hypothetical Capital Structure | Cost | Weighted Cost |
|---|---|---|---|
| Debt | 55 | 7.00 | 3.85 |
| Common Equity | 45 | 13.20 | 5.94 |
| Total | | | 9.79 |

is some intuitive appeal to this approach, we are wary of intuitions in so arcane a context. The only relevant evidence on the subject is that of the Trial Staff's witness (with whom incidentally Commissioner Goode's assistant had an ex parte discussion), who testified only that a cost of common equity figure intended to reflect original cost would have to be reduced to avoid duplication when used in relation to a fair value rate base. But the Commission has gone beyond an adjustment to the cost of common equity and has, without record support or explanation, adjusted the composite cost of capital. In addition, the Commission has provided no explanation, other than a circular reference to the overall rate of return, for its determination that 13.2% represents Blue Mountain's cost of common equity. We are compelled to return the record to the Commission for clarification of findings concerning fair rate of return.

Therefore, we enter the following

ORDER

AND Now, this 6th day of March, 1981, the order of the Public Utility Commission, adopted September 27, 1979, is reversed; the record is remanded to the Commission for the adjustment of operating revenues to reflect State and Federal income taxes based on actual interest expense, for new findings as to fair rate of return, and for new findings as to the utility's entitlement to operating revenues and to income available for return, consistent with this opinion.