600 A.2d 251

**ARROWHEAD PUBLIC SERVICE
CORPORATION, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 1991.

Decided Nov. 25, 1991.

Anthony C. Lomma, for petitioner.

Kathryn G. Sophy, Asst. Counsel, for respondent.

Christine Maloni Hoover, Asst. Consumer Advocate, for intervenor Office of Consumer Advocate.

Before CRAIG, President Judge, PELLEGRINI, J., and NARICK, Senior Judge.

PELLEGRINI, Judge.

Arrowhead Public Service Corporation (Arrowhead) files a Petition For Review, appealing an Order of the Public Utility Commission (Commission) denying Arrowhead's request for a rate increase and reducing Arrowhead's current rates for sewage treatment.

The sewage treatment service at issue began in 1976 to serve the Arrowhead Lakes Development (Development) located in Monroe County, Pennsylvania. The Development was constructed by the All–American Realty Company, Inc. (All–American). All–American's wholly-owned subsidiary, Arrowhead North Sewage Company (Arrowhead North), operated the plant as a public utility. In the early 1980's, All–American began to experience financial difficulties and filed for bankruptcy. As a result of the bankruptcy proceedings, All–American deeded the remaining unsold lots in

the Development and its stock in Arrowhead North to two creditor bank's holding companies. In 1987, National Utilities, Inc. (NUI), a company which owns several other utilities, formed Arrowhead as a wholly-owned subsidiary to purchase the plant and the remaining lots from the banks at a "distressed price" of $50,000.00.

On December 18, 1989, Arrowhead filed for a rate increase designed to produce $117,093.00 in additional revenue, an increase of 53%. On January 31, 1990, the Office of Consumer Advocate (OCA), among others, filed Formal Complaints against the proposed increase, alleging that the proposed increase was unjust, unreasonable, and otherwise unlawful. Hearings were held before an Administrative Law Judge (ALJ) who issued a Recommended Decision, finding that Arrowhead had shown a need for only $204,-998.00 in total annual operating revenues, an amount $28,-615.00 less than Arrowhead's present level of rates. All parties filed exceptions from the ALJ's Recommended Decision to the Commission.

■ The Commission entered an Order finding that Arrowhead had only established the need to produce annual operating revenues of $194,870.00 to cover its reasonable and legitimate costs of providing service, and ordered Arrowhead to reduce its present level of revenues by $34,-743.00. Arrowhead petitioned the Commission for reconsideration of its Order, which was denied. Arrowhead now appeals the Commission's Order alleging that several errors were committed. We will address each *seriatim.*[1]

### A.

### *Original Cost of the Plant*

Arrowhead contends that the Commission erred by deducting from Arrowhead's rate base the amount of $667,-

1. We must accept the Commission's discretionary findings and conclusions unless they are totally without support in the record, are based on an error of law, or are unconstitutional. *Pennsylvania Public Utility Commission v. Philadelphia Electric Company,* 522 Pa. 338, 561 A.2d 1224 (1989).

554.00, representing the acquisition adjustment it made to the Pre–1987 Plant in Service. This acquisition adjustment represented the construction cost of the original plant when it was owned by Arrowhead North and first dedicated to public service, minus applicable depreciation. The Commission, in affirming the ALJ's Recommended Decision, held that Arrowhead could not use this acquisition adjustment, because Arrowhead failed to meet its burden of proving that the original cost of the Pre–1987 Plant did not contain Contributions In Aid of Construction (CIAC), which must be excluded from the rate base.

The Commission found that there was evidence that CIAC existed in the original cost of the Pre–1987 Plant, because the plant was built and financed by the developer, All–American, using contributions derived from the purchase price of the lots in the Development. The Commission held that since the evidence showed that the original cost of the plant was entirely CIAC, such cost could not be used as part of Arrowhead's rate base. As a result of this finding, the Commission adopted the ALJ's proposed deduction of $667,554.00 from the item of the Pre–1987 Plant.

In establishing a rate base, the Commission must apply the provisions of the Public Utility Code (Code).[2] Section 1311(b) of the Code provides as follows:

> (b) Method of valuation. The value of the property of the public utility included in the rate base shall be *the original cost of the property when first devoted to the public service,* less the applicable accrued depreciation, *as such depreciation is determined by the commission.*

66 Pa.C.S. § 1311(b). (Emphasis added.) More importantly, the burden of proving the justification for an accounting entry of original cost, or any other entry, if such is questioned by the Commission, is upon the public utility making such an entry. 66 Pa.C.S. § 315(d).

 Arrowhead contends that pursuant to Section

2. 66 Pa.C.S. §§ 101–3314.

1311(b)[3] of the Code, it has met its burden of proving the original cost of the plant when it was owned by Arrowhead North and first devoted to the public service, minus the accumulated depreciation, and should be able to include this cost in its rate base.

■ A utility is entitled to include in its rate base the value of the property used and useful in providing the public service and for which the utility is entitled to a reasonable rate of return. *See Pennsylvania Gas and Water Co. v. Pennsylvania Public Utility Commission,* 79 Pa.Commonwealth Ct. 416, 470 A.2d 1066 (1984). However, a utility is only entitled to earn a return on that property which it funded; not on that property which was contributed to it by others. *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Co.,* 492 Pa. 326, 424 A.2d 1213 (1980), *cert. denied,* 454 U.S. 824, 102 S.Ct. 112, 70 L.Ed.2d 97 (1981). In *Pennsylvania Gas and Water,* the Pennsylvania Supreme Court held that $2.7 million contributed to the utility by the Pennsylvania Department of Highways to minimize an adverse effect on the watershed as a result of a federally funded highway project should be excluded from the rate base. *Id.*

The Pennsylvania Supreme Court's decision in *Pennsylvania Gas and Water* was presaged by the Commission's own decisions. The Commission has consistently taken the position that funds contributed to the utility to aid in its construction, CIAC, shall be excluded from the rate base. In *Pennsylvania Public Utility Commission v. West Penn Power Company,* 53 Pa. PUC 410, 429 (1979), the Commission stated that it is their practice to deduct "customer-supplied capital" from the rate base. Customer deposits made to the utility must be deducted from the rate base

**3.** Since the commencement of this action, the General Assembly has amended the Code by the Act of April 4, 1990, P.L. 107, § 1, adding Section 1327, which provides that where a sewer utility acquires property at a cost which is lower than the depreciated original cost, the difference must be amortized as an addition to income or passed on through to the ratepayers. *See* 66 Pa.C.S. § 1327. However, it is undisputed that this section does not apply retroactively.

because such money is not investor-supplied. *See Pennsylvania Public Utility Commission v. Equitable Gas Company*, 60 Pa. PUC 127 (1985).

Moreover, in *Pennsylvania Public Utility Commission v. Poconos Water Company*, 53 Pa. PUC 363 (1979), the Commission held that where a real estate developer actually constructs the sewage utility using funds provided by the property owners through the purchase price of their lots, the entire plant has been contributed to the utility and shall be excluded from the rate base. The utilities involved in *Poconos Water* serviced a resort community in the Pocono Mountains in much the same fashion as the case now before us. The construction of the utilities was financed by the developers of the resort community in exchange for approximately $5.8 million in demand notes. The utility was subsequently sold by the developers for $1.2 million. The company purchasing the utility sought to use the $5.8 million as its rate base. *Id.*

The OCA in *Poconos Water* argued that the demand notes were a fiction, and that the plant was built with CIAC provided by property owners in the resort community through the purchase price of their lots. The Commission stated that once the OCA raised a valid argument that CIAC existed, the burden shifted to the utility to prove that CIAC did not exist. *Id.* at 368. The Commission, while unwilling to consider the demand notes as fiction, held that the utility did not meet its burden of proving that CIAC did not exist. *Id.* at 368. The Commission stated that CIAC need not be bargained for or provided directly to the utility, but can be provided indirectly, especially where the developer and the utility have common ownership. *Id.* at 369.

In *Pennsylvania Public Utility Commission v. Valley Utilities Company, Inc.*, 72 Pa. PUC 310 (1990), the Commission again held that a sewage utility, which was a wholly-owned subsidiary of a developer of a resort community, was not permitted to include in its rate base those portions of the plant installed by the developer because the plant was contributed. The Commission found that indirect

CIAC from the parent company existed, because the utility failed in its burden to disprove evidence that the cost of the lots in the development did not include funds used by the parent company to construct the utility. *Id.*

■ We agree with and adopt the rationale of the Commission in *Poconos Water* and *Valley Utilities* that CIAC are not to be included in the rate base. Once the Commission finds that the OCA sufficiently raised the issue that CIAC existed in the amounts included in Arrowhead's rate base, under Section 315(d) of the Code, 66 Pa.C.S. § 315(d), it is incumbent on Arrowhead to prove that CIAC did not fund the items being included in the rate base and that Arrowhead North actually invested in the plant.

OCA raised the issue before the Commission that the plant was contributed to Arrowhead North by its parent company, All–American, who built the plant using contributions from the property owners in the Development. The OCA contended that Arrowhead was attempting to get a "windfall" return on an investment that neither it nor the prior utility, Arrowhead North, made. In support of its allegation, the OCA pointed to the language of a restrictive covenant in the property owners' deeds as evidence that part of the purchase price of the lot was going to go to All–American to build the plant.

Moreover, OCA brought the Commission's attention to an entry of Notes Payable on Arrowhead North's balance sheet contained in its Annual Report to the Commission. OCA argued that such an entry could not have been the result of a bank loan as Arrowhead claimed, but was merely the value of the plant as contributed by All–American, since the alleged Notes were never produced, an interest charge was never recorded, and the entry for the Notes matched the amount of Plant in Service each and every year. In effect, OCA argued that All–American used CIAC derived from the property owners to construct the plant and then transferred the plant at no cost to Arrowhead North, with the Notes Payable being a mere paper transaction and not

representative of any debt financing on the part of Arrowhead North.

■ Because the issue of CIAC was sufficiently raised before the Commission, the burden of proof shifted to Arrowhead to prove that the plant was built with investor supplied capital.[4] Arrowhead argues that it successfully established that the plant was not constructed with CIAC funds, but with investor supplied capital, by the entries for Notes Payable on Arrowhead North's Annual Report to the Commission. Arrowhead contends that these entries establish that its predecessor utility, Arrowhead North, borrowed funds from a bank to build or acquire the plant, and that the Notes Payable were not the result of a loan from All-American to Arrowhead North. Arrowhead further contends that the invoices it submitted to show the value of the plant prove that Arrowhead North alone paid for its construction.

We agree with the Commission that by presenting this evidence, Arrowhead did not meet its burden of proving that the plant was not constructed with CIAC funds. Not only did Arrowhead fail to produce a copy of the purported bank note or any proof that such a loan existed, it could not even identify the bank, when the loan was made or its terms. *See* Commission's Order pp. 27–28, 33. The Commission's finding that the plant was built not with investor supplied capital but with CIAC funds is supported by substantial evidence. Arrowhead North's Annual Report filed with the Commission failed to record the payment or non-

4. Arrowhead cites the Commission's decision in *Center Square Civic Association v. Center Square Water Company,* 53 Pa. PUC 583 (1979), in support of the proposition that the evidence offered by the OCA to show CIAC was mere speculation without evidentiary support and insufficient to question the adequacy of the proof offered by the utility. However, Section 315(d) of the Code specifically places the burden of proving that an account entry is justified on the utility if such is questioned by the Commission. Since the Commission found reasonable evidence that CIAC may have existed, the Commission acted properly in requiring Arrowhead to bear the burden of proving that CIAC did not exist.

payment of any principal or interest charge on the loans, which would be customarily paid if those notes represented a bank loan. Commission's Order pp. 27–28. Contrary to Arrowhead's contention, the Commission found that the invoices and purchase orders for materials used in the construction of the plant show that All–American paid those invoices rather than Arrowhead North. Commission's Order p. 28.

Furthermore, the Commission found that Arrowhead did not rebut the inference of customer contributions exhibited by the language of a restrictive covenant in the property owners' deeds and through the testimony of the property owners themselves. The restrictive covenant provided in relevant part:

> All–American Realty Co., Inc. (Developer) will construct a central sewage system providing sewer service to lots in Sections 14 through 21.[5]

(Reproduced Record (R.R.) 71a). (Footnote added.) The Commission found that the language of the deeds provided evidence that money from the purchase price of the lot was used to fund the plant.[6] Commission's Order p. 27. The Commission also found that the property owners believed that All–American and Arrowhead North were the same entity, and that they were paying for the construction of the plant through the purchase price of the lots which had sewage service provided to it by Arrowhead North. Commission's Order pp. 27–28.

Since Arrowhead failed to present sufficient evidence to prove that the original cost of the plant did not contain CIAC, the Commission's finding excluding that amount

5. The sections referred to are those lots in the Development which have sewage service provided them by Arrowhead. Other sections of the Development have on-site sewage, i.e., septic tanks.

6. At the time that Arrowhead acquired the plant from the banks, the remaining lots which were part of the package were sold to Stratford Development, Inc. An agreement was established whereby Stratford would contribute up to $1,250.00 per lot sold to a CIAC escrow fund for future expansion of the plant.

from the rate base was proper.[7]

## B.

### Debt Cost

Arrowhead contends that the Commission committed an error of law and abused its discretion when, for purposes of calculating Arrowhead's rate of return, it used Arrowhead's debt cost of 7.35% instead of the debt cost of its parent company, NUI, which was 8.85%. Following the sale of the plant to Arrowhead, NUI arranged for three loans from the two banks involved in the sale of the plant. The loans were made specifically to Arrowhead but unconditionally guaranteed by NUI. The three loans totalled $1,050,000.00, with an average stipulated rate of interest of 7.35% and were used to purchase the assets of the plant and to make $1 million in capital improvements.

Arrowhead contends that although the debt it holds in the form of three bank loans is in its name, the actual source of this financing is NUI, who arranged the loans at favorable terms, and as such, NUI's cost of debt should be used. Arrowhead contends that the Commission normally substitutes the parent companies' debt cost for that of the subsidiary, and has consistently applied the debt cost of NUI in past rate cases involving NUI's other utilities in Pennsylvania. However, the OCA contends that the Commission was correct in finding that Arrowhead has procured its own debt, and that Arrowhead's debt cost should be used because it is readily identifiable.

■ In determining a fair rate of return for a utility, the Commission must determine the utility's cost of capital. The cost of capital is a percentage figure of the cost a utility is obliged to pay to obtain debt and equity capital.

7. The Commission also held that the issue of whether Arrowhead's adjustment to its depreciation reserve was proper was moot, because the Pre–1987 Plant on which the depreciation was to be taken was to be excluded from the rate base. Since we will affirm the Commission's findings regarding the exclusion of the Pre–1987 Plant from the rate base, this issue is rendered moot.

*Carnegie Natural Gas Co. v. Pennsylvania Public Utility Commission*, 61 Pa.Commonwealth Ct. 436, 433 A.2d 938 (1981); *Blue Mountain Consolidated Water Co. v. Pennsylvania Public Utility Commission*, 57 Pa.Commonwealth Ct. 363, 426 A.2d 724 (1981).

In *Lower Paxton Township v. Pennsylvania Public Utility Commission*, 13 Pa.Commonwealth Ct. 135, 141, 317 A.2d 917, 921 (1974), this Court stated that:

> The cost of capital study should give consideration to the utility's *financial structure*, credit standing, dividends, interests, risks, regulatory lag, wasting assets and *any peculiar features of the utility involved*. (Citation omitted.) Because of these many variables, the cost of capital is basically a *matter of judgment governed by the evidence presented and the regulatory agency's expertise*. (Emphasis added.)

Moreover, we stated that "where the findings of the PUC relative to the cost of capital are within 'the scope of the evidence,' its findings will not be disturbed." *Lower Paxton*, 13 Pa.Commonwealth Ct. at 142, 317 A.2d at 921.

In *Lower Paxton*, the public utility, which was a wholly-owned subsidiary of another corporation, had an unusual capital structure consisting of 100% equity capital and no debt. This capital structure was not comparable to other public utilities which were obliged to obtain equity and debt financing in the open market. The evidence of record disclosed that all of the utilities' financing came from the parent company. *Lower Paxton*, 13 Pa.Commonwealth Ct. at 144, 317 A.2d at 922. We stated that "[u]nder such circumstances, the PUC must make adjustments based upon substantial evidence in order to reach a fair result." *Lower Paxton*, 13 Pa.Commonwealth Ct. at 142, 317 A.2d at 921. We held that the PUC may utilize the capital structure and cost of capital of the parent company or of a comparable utility to determine the cost of capital for the subsidiary utility. *Id. See also Carnegie; Blue Mountain.*

570

■ In the present case, it is undisputed that NUI arranged for the banks to extend credit to Arrowhead, is the guarantor of the loans, and is at least partly responsible for the favorable debt financing received by Arrowhead. However, the fact that the rates Arrowhead received may have been slightly more favorable because of NUI's intervention is not sufficient to ignore the actual debt cost to Arrowhead in favor of NUI's.

■ The actual cost of debt to Arrowhead, 7.35%, is readily identifiable on the face of the bank notes. (R.R. 219a–231a). The banks are not affiliated with NUI and are the actual entities providing the debt financing, not NUI. We agree with the Commission that it must always try to use the utilities' actual cost of debt where the cost is clearly identifiable and where the financing does not come directly from the parent company. We also agree with the Commission that to accept NUI's experienced cost of debt would result in an unnecessary subsidization of NUI by the customers of Arrowhead. The ratepayers should not be denied the benefit of the favorable financing. Therefore, the Commission was correct in rejecting Arrowhead's use of NUI's debt cost.

Accordingly, we will affirm the Commission's Order.

## ORDER

AND NOW, this 25th day of November, 1991, the Order of the Pennsylvania Public Utility Commission dated October 9, 1990, is affirmed.