# Alpha Portland Cement Company et al., Appellants, v. Public Service Commission.

*Public service company law—Electric light companies—Rates—Reasonableness of—Discrimination.*

A public service company, engaged in the business of supplying electricity has the right to charge different rates for its services rendered under different conditions.

Such a difference in rates is not unlawful, as applied to different classes of consumers, where the business interests of the company are responsible for the establishment of different rates, and where the lower rate to one patron does not injuriously affect the other patron in the conduct of his business.

Under the provisions of section 8 of article III of the Public Service Company Law, prohibiting discrimination, there is no requirement that rates for different classes of service be either uniform or equal, or even equally profitable to the utility. The requirement is merely that rates for one class of service shall not be unreasonably prejudicial and disadvantageous to a patron in any other class of service. Before a rate can be declared unduly preferential and, therefore, unlawful, it is essential that there be not only an advantage to one, but a resulting injury to another. Such an injury must arise from collecting from one more than a reasonable rate to him, in order to make up for inadequate rates charged to the other, or because of a lower rate to one of two patrons who are competitors in business. There must be an advantage to one at the expense of the other.

Where the commission has found on competent and substantial evidence that the rates charged to consumers have not been more than is reasonable to them, that they have been given the same rate as has been charged to others in their class, and that they have suffered no prejudice or disadvantage on account of the relatively lower rates charged to other classes of patrons, the rates are not discriminatory or unreasonable.

Argued October 6, 1924. Appeals, Nos. 38, 39, 40 and 43, Oct. T., 1924, by Alpha Portland Cement Company et al., from order of the Public Service Commission of the Commonwealth of Pennsylvania, Complaint Docket Nos. 3036, 3037, 3045, 3048, 3698, 3704, 3705 and 3711, in the case of Alpha Portland Cement Company et al. v.

Pennsylvania Power & Light Company.    Before OR-LADY, P. J., PORTER, HENDERSON, KELLER, LINN and GAWTHROP, JJ.    Affirmed.

Complaint against schedule of rates filed by Pennsylvania Power & Light Company.

The facts are stated in the opinion of the Superior Court.

The Public Service Commission dismissed the complaint. Following are the material parts of the report:

The first group of complaints was filed against respondent's Schedule P-2, which became effective on October 15, 1919, it being alleged that the rates were excessive, unreasonable, and (by amendment) discriminatory, and in violation of the rate provisions of said contracts.  Hearings were held, and before the case was completed, a further increase became effective on October 1, 1920, by the establishment of respondent's Schedule P-18.  This led to the filing of the second group of complaints with similar general allegations.

In September, 1919, the Lehigh Navigation Electric Company was merged with other companies into The Lehigh Valley Light & Power Company, which filed the answer to the first group of complaints.  This merger was a first step in a more comprehensive plan which culminated, in June, 1920, in the merger of The Lehigh Valley Light & Power Company and other companies into the Pennsylvania Power & Light Company, which thereby becomes the respondent in these proceedings.  The complaints were consolidated for hearing and will be disposed of in one report.

The burden of proof is on the respondent.  The amounts in issue are very large; for example, the actual charges for service to the cement companies in 1921 totaled $1,495,445; complainants contend that a reasonable charge would have been about $1,000,000 or a difference of approximately $500,000 per year.  The commission has given the parties the fullest freedom as to time

and extent and order of presenting their respective viewpoints. Numerous experts for both parties testified at great length and wide differences of opinion were developed in great detail, resulting in a record of over 7,800 pages of testimony and 143 exhibits, many of which are volumes in themselves; a voluminous record of extremely technical content. A detailed presentation in this report of the facts and a disposition of the many disputed points, item by item, in the opinion of the commission would be undesirable and is unnecessary.

The Lehigh Navigation Electric Company was formed in 1912, and acquired by consolidation or later purchases, electric charter rights in various townships in Lehigh, Carbon, Monroe, Northampton, Schuylkill and Berks Counties. It constructed a 25-cycle power station, designed for the use of small-sized anthracite coal and located at Hauto in close proximity to the mines of the Lehigh Coal & Navigation Company, which was the originator and owner of the enterprise. Transmission lines and substations were built and at the beginning of these proceedings the system was carrying a maximum load of approximately 33,000 k. w. and was selling approximately 180,000,000 k. w. h. per year, to 183 customers, of which number about 84 were lighting customers. A group of eight cement companies took about 50% of the power with delivery at scattered points in the cement region, the balance being taken by miscellaneous consumers with scattered points of delivery, including two large consumers—the Bethlehem Steel Company and the Lehigh Coal and Navigation Company; the latter taking delivery at Hauto Station. The Pennsylvania Power & Light Company is a very large operation serving a vast territory reaching from the Delaware above Easton, through Allentown and the anthracite regions to the Susquehanna at Sunbury and beyond. In addition, its service includes light and power in the larger municipalities in its territory as well as service of the nature rendered

by that part of its system which formerly was the Lehigh Navigation Electric Company.

In view of the consolidations taking place and imminent at the time hearings began in these cases and because of the clearly defined and unusual characteristics of the property and service of the Lehigh Navigation Electric Company, it was desirable and possible to present a test of the reasonableness of the rates in question without bringing in the complications due to an inclusion of the distribution systems and the miscellaneous lighting and power loads making up the rest of the facilities and service of the Lehigh Valley Light & Power Company, and later the Pennsylvania Power & Light Company. This was done in two ways. The first basis is referred to as "The L. N. E. Co. System Basis," and may be summarized as including all operations and all property which would have been necessary to serve the business of the L. N. E. Co., including whatever growth took place, assuming that company to have continued a separate corporate and physical existence. The production facilities at Hauto were insufficient in capacity to carry the entire loads of the L. N. E. Co. System. The additional power required was obtained for the most part from other stations of the respondent company, which introduces into this basis the question of the cost of such "purchased power" and the cost of the facilities furnishing it. In other words, this portion of the respondent's system is assumed to purchase power from the remaining portion and the total cost of energy is based upon the cost of production at the Hauto 25-cycle station, plus the cost of power purchased from the remainder of respondent's system, plus the cost of power purchased from outside interests.

The second basis of test submitted is referred to as the "Pennsylvania Power & Light Production System Basis." On this basis the cost of energy needed to supply the customers of the L. N. E. Co. System is determined by the costs of production and the costs of purchased power

for the entire operation of the P. P. & L. Co.   Similarly
with respect to investment costs and reproduction costs
of production facilities.   All other costs such as those
incident to transmission, distribution, general expense,
etc., are taken the same as in the L. N. E. Co. System
Basis.

\*     \*     \*     \*     \*     \*     \*     \*     \*

On the entire showing the commission is of the opinion
that the rates charged by the respondent for service to
the cement companies have not yielded any unreasonable
return and will not do so in the near future unless there
should be marked changes in cost levels and in operating
conditions.

Complainants contend that both the P-2 and P-18
rates are unjustly discriminatory in that increases made
by these rates were not accompanied by increases in the
rates charged the Lehigh Coal & Navigation Company,
the Bethlehem Steel Company, or the Lehigh Valley
Transit Company, and that even under respondent's
allocation of operating expenses and capital costs, the
service to the complainants is yielding a higher rate of
return than is yielded by the other three services men-
tioned.

The power sold to the L. V. T. Co. is measured and de-
livered at Catasauqua, is mostly taken between the hours
of 4:00 p. m. and 6:30 a. m., when the respondent has
spared capacity available and by definition and practice
is clearly off peak power.   In later years the revenue
from this source has averaged about $150,000 per annum.
The average charge in 1919 and 1920 was about .68 cts.,
in 1921 about 1.01 cts., and in 1922 about .91 cts, per
k. w. h.   The margin between price received and allo-
cated operating cost has ranged from 29% to 87%,
averaging about 51% for the period 1919-1923 inclusive.
This is a substantial margin for off peak service and in
the opinion of the commission does not indicate an un-
duly preferential situation and is therefore not unjustly
discriminatory.

The Bethlehem Steel Company owns and operates a 25-cycle generating station with an installed capacity of over 20,000 k. w., producing power by the utilization of blast furnace and other oven gases.  It purchases power from the respondent at 110,000 volts, measured and delivered at Bethlehem.  On holidays, Saturdays and Sundays, it has excess capacity available and sells power to respondent.  The power it purchases has been charged for under tariff rates which were increased in 1919, 1920 and 1921.  The amount of power purchased by the Bethlehem Steel Company has been decreasing, the revenues ranging from about $446,000 in 1919, to an estimate of $358,300 for 1923.  The average cost per k. w. h. within this period has ranged from 1.53 cts. in 1919, 1.46 cts. in 1920, 1.59 cts. in 1921 and 1922, to 1.68 in 1923. The amounts available for depreciation and return for the period 1920-1923 inclusive have averaged 8.0% of the investment cost under the L. N. E. Co. System Basis, which is to be compared with an average of 10.2% yielded by the cement service during the same period. Under the P. P. & L. Co. Production Basis and for the period 1921-1923, inclusive, the corresponding figures are 8.9% for steel company service and 7.3% for cement service.  The determination of the price reflected the competitive situation and the special characteristics of the service.  At times of near system peaks respondent can and does call upon the Bethlehem Steel Company to lessen its demand, and to this extent the operating characteristics of the load permit and result in a lower peak responsibility.  The load is also utilized advantageously in improving the power factor on respondent's transmission lines and system generally, although the extremely fluctuating character of the load has an adverse effect on the fuel economy at the Hauto station.  The interchange provision has been valuable to respondent in ordinary operation in affording opportunity for maintenance work on its own facilities and on numerous occasions as a source of power at times of serious difficul-

ties due to break downs, etc. Viewing this situation as a whole, the commission is of the opinion that it is not prejudicial to complainants or unduly preferential to the Bethlehem Steel Company.

Power is purchased by the L. C. & N. Co. at the Hauto station of the respondent and therefore is not subject to transmission losses or costs. The load is increasing steadily, the maximum demand in 1922 being 13,041 k. w. It drops off approximately 6,000 k. w. with great regularity at 4.p. m. every weekday, and the capacity thus released is sold by respondent as off peak service. The applicable tariff rates contain a provision for a yearly adjustment based upon the fuel costs per k. w. h. at the Hauto station, and except for the operation of this fuel clause there has been no change in the basis of charge. The revenues have ranged from $379,200 in 1919, to an estimate of $560,000 for 1923. The average charge per k. w. h. was practically 1.1 cts. in 1919, 1.01 cts, in 1921 and 1.16 cts, estimated for 1923. The service, under either basis of test, has not always carried its full share of the operating expense but there has not been an actual out of pocket loss on operating expense. Under the L. N. E. Co. System basis the allocated operating expenses exceed the revenues by .31% of the average investment cost for the period 1920-1923 inclusive, and by .71% for the period 1921-1923 inclusive. For the latter period the showing under the P. P. & L. Co. Production basis is less favorable, the deficiency averaging 4.4% of the investment cost. If all of the net earnings from L. N. E. Co. System off peak service were credited to L. C. & N. Co. Service, on the theory that the service is all carried by capacity released by the falling off in coal company requirements, the showing under the L. N. E. Co. System basis is about 3.1% available for depreciation and return, and under the P. P. & L. Co. production system basis a deficiency of about 2.4%, on the average investment cost for the same period. The revenue from this service would have to be increased about $175,000 per

year or about 38% in order to provide the same relative net earning power as shown by the cement service for the same three-year period.

The determination of whether this situation involves unjust discrimination or undue preference requires consideration not only of the degree of departure from uniformity of return and proportionality of rates, but also a consideration of the special circumstances surrounding this service and their effect upon the entire operations of the respondent. The L. C. & N. Co. owned or controlled the Lehigh Navigation Electric Company and the Harwood Electric Company. About in 1917, the interests controlling the respondent began the acquisition and combination of properties resulting ultimately in the P. P. & L. Co. system. The electric properties owned by the L. C. & N. Co. were necessary and a part of the proposed development. The coal company owned not only the electric companies but it owned the water supply necessary for the operation of the Hauto station, it owned the adjacent mines from which the coal used in the Hauto station was obtained under favorable freight rates, and it owned the large areas of land surrounding the Hauto station over which the transmission lines necessary to reach the power markets had to be carried. The obvious intent of the purchasing interests was an assurance of the continuance of the water supply, the coal supply, and right-of-way privileges at reasonable costs. As a part of the negotiations and transactions incident to the sale and purchase of the electric properties, a group of contracts was executed, all part and parcel of one transaction conducted at arm's length, and covering the following items: A 50-year contract for the sale of power to the coal company at specified rates; a 50-year contract for the sale of coal to the electric company at prices not to exceed certain average market prices; a contract for the sale of water and the use of the Hauto dam as a cooling pond as long as the electric company maintains a power station at Hauto; and cer-

tain right-of-way agreements covering both price and procedure. The operation of the electric power contract upon the charges paid by the L. C. & N. Co. has been indicated. The operation of the coal contract has given the respondent a supply of coal at the market price and there has not been any application of the clause in this contract providing for increased payments for coal to effect increased charges for electric power. The contracts for the supply and use of water and the contracts covering right-of-way privileges and payments have operated as intended. Beginning approximately at the time the rates for cement service were increased in 1919, respondent endeavored to obtain increased rates from the L. C. & N. Co. The matter was pressed vigorously to the point where respondent's representatives were told by the general officers of the coal company that if the rates for service to it were increased beyond the provisions of the electric power contract, the respondent would not obtain any coal and the whole group of contracts would be cancelled by the coal company.

The operation of the electric power contract of 1917 under the radically changed conditions of 1920-1923 has resulted in charges for service that barely carry a proportionate share of the operating expenses and that yield little or no return on property chargeable to this service. The operation of the coal contract has enabled respondent to obtain coal from neighboring mines at market prices and at the same time obtain full advantage of the favorable freight rates, the advantage in freight rates amounting to $374,000 per year for the 25-cycle Hauto station and $554,600 per year for the 25- and 60-cycle Hauto stations, on the basis of 1923 fuel requirements, which are less than those of 1919, 1920 and 1921. Any action which might result in voiding the contract for water and for the use of the Hauto dam as a cooling pond, would bring with it the possibilities of increased costs amounting to $145,800 for the 25-cycle station operation and $229,400 for the combined stations, on the

basis of 1923 requirements. These possible added costs are to a certain extent a measure of the advantages secured by respondent through this group of contracts. The material advantages resulting from the favorable freight rates, the favorable charges for water and water service, and the favorable aspects of the right-of-way agreements, have all been reflected in respondent's operating cost statements and have all been shared by complainants and by the other patrons of the respondent. It is apparent that the respondent realized that it should obtain higher rates for this service but that action was stayed by the attitude of the L. C. & N. Co., which company controlled the water supply and service, the rights of egress from the station, and the fuel supply from near-by and favorable sources. Respondent contends that to have forced the issue would have resulted in an increased burden of costs to be borne by all of its customers and that whatever lack of return there has been on the coal company service, it has been absorbed by respondent and has not been a burden on its other services, which have participated in the benefits of the favorable coal and water contracts.

The commission is of the opinion that while the rates charged to the L. C. & N. Co. do not yield an appreciable return on the property involved, there are material advantages offsetting this situation; that whatever the preference may be, it has not been prejudicial to complainants, who have not paid more than a reasonable return on the cost of the property serving them; that no benefits would accrue to the complainants or to the other customers of the respondent if the commission undertook a revision of the charges for service to the L. C. & N. Co., either in this or in an independent proceeding; that the effect of such action would most likely be a revision upwards of the charges for other services and therefore adverse to the complainants and to the other customers of the respondent. The problem before the commission is essentially an administrative one and

the practical aspects of the situation appear controlling to the commission and to far outweigh any theoretical consideration pointing towards equality of return and proportionality of rates.

Our conclusions, reached upon the whole record as discussed in this report, are that the respondent has successfully sustained the burden of proof cast on it by law, and that the complaints should be dismissed. An order to that effect will be issued.

Plaintiff appealed.

*Error assigned* was the order of the commission.

*Louis H. Porter* and *David Wallerstein,* and with them *Kirkpatrick & Maxwell, Inman Padgett, George T. Coffin* and *Abraham Israel,* for appellants.—The rates in question were unjust and discriminatory when compared with rates charged other consumers. Suburban Water Co. v. Oakmont Borough, 268 Pa. 243; Leiper v. R. R. Co., 262 Pa. 328; St. Clair Coal Co., Inc., v. Public Service Commission, 79 Pa. Superior Ct. 528; City of Phila. v. Public Service Commission, 83 Pa. Superior Ct. 8; United States v. Illinois Central R. R. Co., 263 U. S. 515, 44 Sup. Ct. 189; Tyrone v. Home Electric Light & Steam Heating Co., P. U. R. 1920-C. 562, at p. 566; Salisbury & Spencer Ry. Co. v. Southern Power Co., 179 N. C. 18; Jamaica Gaslight Co. v. Nixon, a New York case, 110 Misc. 500, affirmed 192 App. Div. 959; Ketterlinus v. Bar Harbor & Union River Power Co., P. U. R. 1920, B-513; Wyman on Public Service Cos., sections 1312, 1313; Griffin v. Goldsboro Water Co., 122 N. C. 206; Wight v. United States, 167 U. S. 512; Interstate Commerce Commission v. Texas & Pac. R. Co., 52 Fed. 187; Orange v. Athol Gas & Elec. Co., P. U. R. 1920, C-1033.

*Ralph J. Baker* and *Thomas J. Perkins,* for appellee. —Differences in rates which do not injuriously affect the

patrons of the utility are not discriminatory: Baxendale v. Ry. Co., 4 C. B., N. S. 63; Interstate Commerce Commission v. B. & O. R. R. Co., 145 U. S. 263, 12 Sup. Ct. Rep. 844; Texas & Pac. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, 16 Sup. Ct. Rep. 666; Cincinnati, etc., Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184; 16 Sup. Ct. Rep. 700, and 167 U. S. 479, 17 Sup. Ct. Rep. 896; Hutchinson on Carriers, 3d ed., section 521, p. 570; Hoover v. P. R. R., 156 Pa. 220; Mercur v. Media Electric L. N. & P. Co., 19 Pa. Superior Ct. 519; Allegheny County Lt. Co. v. Shadyside El. L. Co., 37 Pa. Superior Ct. 79; Steinman v. Edison Electric Illuminating Co., 43 Pa. Superior Ct. 77.

The complainants have no interest in having rates raised to other customers with which they are not in competition, where they are not injured or affected by such rates: Boerth v. Detroit City Gas Co., 116 N. W. 628; Elk Hotel Co. v. United Fuel Gas Co., 83 S. E. 922; State of Alabama ex rel. Ferguson v. Birmingham Water Works Co., 51 So. 354; Mitchell Coal & Coke Co. v. Penna. R. R. Co., 181 Fed. 403, 411; Suburban Water Co. v. Oakmont Borough, 268 Pa. 243, 255.

OPINION BY GAWTHROP, J., February 27, 1925:

The Alpha Portland Cement Company, the Nazareth Cement Company, the Penn-Allen Cement Company, and the Coplay Cement Manufacturing Company filed complaints with the Public Service Commission against an increase in rates proposed to be charged them by the Lehigh Navigation and Electric Company for electric power service under its schedule P 2, alleging that the new rates were excessive, unreasonable and discriminatory. Shortly thereafter in September, 1919, the Lehigh Navigation and Electric Company was merged with other companies into the Lehigh Valley Light and Power Company, which filed an answer to the complaints. This merger was a step in a more comprehensive plan which culminated in June, 1920, in the merger of the Lehigh

Valley Light and Power Company and other companies into the Pennsylvania Power and Light Company, which became the respondent in the proceedings. In the meantime schedule P 18, filed by the Pennsylvania Power and Light Company, provided for a further increase in the rates to be charged to the complainants. This led to the filing of a second group of complaints containing similar allegations. Both sets of complaints were filed before the effective dates of the increase. The proceedings were consolidated and, after numerous hearings, the commission made an order dismissing the complaints. These four appeals are from that order.

The complaints raised all of the usual questions involved in rate cases, in addition to that of discrimination—in fact the latter charge was apparently an afterthought, for it was introduced by an amendment after the hearings had proceeded for nearly a year. Without making any allowance for cost of development or for going concern value, the commission found that the rates charged by the respondent for services to the cement companies had not yielded any unreasonable return and would not do so in the near future, unless there should be marked changes in cost levels and in operating conditions; that the cement companies "have not paid more than a reasonable return on the cost of the property serving them"; that the charge of unjust discrimination against the cement companies and in favor of three other consumers, namely, the Lehigh Coal and Navigation Company, the Lehigh Valley Transit Company, and the Bethlehem Steel Company, hereinafter referred to as Coal Company, Transit Company and Steel Company, respectively, could not be sustained; that the power sold to the Transit Company is off peak power and the margin of profit received from it at the rate charged was substantial and fair for that character of service; that the circumstances under which the Steel Company demanded and received power, including an arrangement under which the Steel Company at times furnished

power to the Power Company, rendered the rate charged to the Steel Company a reasonable one; that while the rates charged to the Coal Company have not yielded an appreciable return on the property involved, whatever preference that company received was not prejudicial to the complainants; that no benefits would accrue to them or to the other customers of the respondent if the commission undertook a revision of the charges for services to the Coal Company, and that the effect of such a revision would probably result in a revision upwards of the charges for other services and therefore would be adverse to the complainants and to the other customers of the Power Company.

All of the many questions raised before the commission have been eliminated in this appeal except one, counsel for appellants stating in their brief that the only issue which they wish to raise here is whether, in view of the rates charged to the Coal Company, the Transit Company and the Steel Company, the rates charged to the Cement Companies are in effect unjustly discriminatory. It is conceded that the rates charged to the appellants were just and reasonable in that they afforded to the utility no more than the cost to it of rendering power service, including as part of the cost a fair return on the property devoted to that service. It is conceded also that the rates required appellants to pay no more than the service is reasonably worth. The commission found the facts which compel these concessions, and no error is alleged in the findings.

The sole ground upon which the appellants base the charge of unjust discrimination is that power service is being rendered to three other patrons, the Coal Company, the Transit Company, and the Steel Company at rates relatively lower, and relatively less profitable than those charged appellants. Conceding for present purposes that this be true, the question arises whether that fact alone amounts to such a discrimination against the appellants as entitles them to the relief sought.

The affirmative statement of the powers of public service corporations with respect to their rates is contained in section 1, of article III, of the Public Service Company Law, which provides that it shall be lawful for every public service company—

"(a) To demand, collect and receive fair, just and reasonable prices, rates, fares, tolls, charges, or other compensation for each and every service rendered or to be rendered by it to any person or corporation, or to any other public service company with whom it interchanges facilities and service."

"(b) To employ, in the conduct and management of its business, suitable and reasonable classifications of its service, patrons and rates; and such classification may, in any proper case, take into account the nature of, the use, and quantity used, the time when used, the purpose for which used, the kind, bulk, value and facility of handling of commodities, and any other reasonable consideration."

The prohibitions upon discrimination are contained in section 8, of article III, which provides that it shall be unlawful for any public service company—

"(a) To charge, demand, collect or receive, directly or indirectly, by any special rate, rebate, drawback, abatement, or other device whatsoever, from any person or corporation, for any service rendered or to be rendered, a greater or less compensation or sum than it shall demand, charge, collect, or receive from any other person or corporation for a like and contemporaneous service under substantially similar circumstances and conditions."

"(b) To make or give any undue or unreasonable preference or advantage in favor of or to any person or corporation or any locality, or any particular kind or description of traffic or service, in any respect whatsoever; or to subject any particular person or corporation or locality, or any particular kind or description of traf-

fic or service, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

These provisions of the statute are substantially declarations of the common law as it had been announced by the courts of this State. They are very similar, both in language and effect, to the constitutional and statutory provisions relating to common carriers considered in Hoover v. Penna. R. R., 156 Pa. 220, and almost identical with sections 2 and 3, of the act to regulate commerce, which contains the federal law on the same subject. The Public Service Company Law expressly repealed the Act of June 4, 1883, P. L. 72, which was passed for the purpose of enforcing article XVII, of section 3, of our Constitution, which provides against undue or unreasonable discrimination in charges for, or in facilities for transportation of freight or passengers within the State. Section 8, of article III, of the act inhibits unreasonable discrimination in all forms of public service. It was decided in Hoover v. Penna. R. R., cited, that the Act of 1883, did not prohibit all discrimination in charges, but only discrimination which was undue and unreasonable; and that the prohibited discrimination was further limited by the consideration that it must be for a like service, from the same place, upon like conditions and under similar circumstances. Mr. Justice GREEN said: "If therefore the discrimination, in a given case, is upon conditions which are not like, and circumstances which are not similar, the act is inapplicable, and its penalties are not incurred." In that case the different circumstances and conditions which were held to justify the differences in freight charges to a manufacturing company and to a retail coal dealer were the following: (a) the former was under contractual obligation to ship a certain number of tons per day which the latter was not; (b) the respective shippers were "not competitors in the same business, and a lower rate to the manufacturer would not, under

the contract, affect the business of the plaintiffs injuriously." It was held that in the circumstances the lower rate for hauling coal to the manufacturer "was neither an undue nor an unreasonable discrimination against the plaintiffs, because it was an immaterial circumstance as affecting their business." In P. & L. E. R. R. Co. v. Colonial Steel Co., 251 Pa. 460 (1916), the Hoover case is cited with approval, Chief Justice BROWN stating that "the policy of the law of this State now was its policy when that case was decided, and we now follow it." Prior to the enactment of the Public Service Company Law, the question of the right of a light, heat and power company to make a discrimination in the rates charged to its customers was before this court in Steinman v. Edison E. Illum. Co., 43 Pa. Superior Ct. 77. We held that such a corporation may classify its patrons under proper conditions and that the principles of classification in the conduct of business is as old as trade itself and familiar to everyone engaged in any branch of commerce. The principles announced in the Hoover case were applied to an electric company which, of course, was not subject to the provisions of the Act of 1883. The same principle was applied in Mercur v. Media Electric L. & P. Co., 19 Pa. Superior Ct. 519. So that even prior to the enactment of the Public Service Company Law, both of the appellate courts of this State recognized the right of a public service company to charge different rates for its service rendered under different conditions, and held that the difference in rates is not unlawful as applied to different classes of patrons where the business interests of the company are responsible for the establishment of different rates, and where the lower rate to one patron does not injuriously affect the other patron in the conduct of his business. The decisions of our own courts are in harmony with what had been decided by the Supreme Court of the United States in construing the Interstate Commerce Act. (See Cincinnati, etc. Ry. Co. v. Interstate Commerce Commis-

sion, 162 U. S. 184.)   The Public Service Company Law removes all doubt which might have existed under the decisions in this Commonwealth as to the considerations which may govern the utility in classifying its service, patrons and rates.   The act expressly authorizes the classifications of patrons and rates, as well as service, and in making such classification, the taking into account of "any other reasonable consideration."   The determination of what is and what is not reasonable is left primarily with the utilities in the exercise of their power "generally to manage their important interests upon the same principles which are regarded as sound, and adopted in other trades and pursuits": Cincinnati, etc. Ry. Co. v. Interstate Commerce Commission, cited.   The action of the utility is subject to the supervision of the Public Service Commission, the question before the commission in such a case being largely of an administrative character which the commission is peculiarly qualified to decide.   The basic principles of law which were applied by the Supreme Court in the Hoover case in the construction of the Act of 1883 are applicable under section 8 of article III of the Public Service Company Law.   It contains no requirement that rates for different classes of service be either uniform or equal, or even equally profitable to the utility.   The requirement is merely that rates for one class of service shall not be unreasonably prejudicial and disadvantageous to a patron in any other class of service.   Before a rate can be declared unduly preferential and therefore unlawful, it is essential that there be not only an advantage to one, but a resulting injury to another.   Such an injury may arise from collecting from one more than a reasonable rate to him in order to make up for inadequate rates charged to another, or because of a lower rate to one of two patrons who are competitors in business.   There must be an advantage to one at the expense of the other. As we said in N. Y. C. & H. R. R. Co. v. Deercreek Lumber Co., 49 Pa. Superior Ct. 453, 460: "The very term

discriminate presupposes some person or persons, natural or legal, who are treated to their detriment." The commission having found on competent and substantial evidence (and that finding is not questioned here) that the rates charged to the appellants have not been more than is reasonable to them, that they have been given the same rate as has been charged to others in their class, and that they have suffered no prejudice or disadvantage on account of the relatively lower rates charged to other classes of patrons, we cannot say that there was any undue or unreasonable prejudice or discrimination against them. They have no better standing to secure relief than had the plaintiffs in the Hoover case. No question of confiscation being involved, they are not entitled to our independent judgment as to matters of fact: Middletown Boro. v. P. S. C., 81 Pa. Superior Ct. 289. We have not deemed it necessary to refer to the evidence upon which the commission based its findings of fact. Our examination of it has satisfied us that there was competent and substantial evidence to support the findings, and that the order made was reasonable.

The order of the commission is affirmed and the appeal dismissed at the cost of appellants.