# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Penn Renewables, LLC, | : | |
| Petitioner | : | |
| | : | No. 337 C.D. 2025 |
| v. | : | |
| | : | Argued: February 4, 2026 |
| Pennsylvania Public Utility | : | |
| Commission, | : | |
| Respondent | : | |

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE LORI A. DUMAS, Judge
          HONORABLE MARY HANNAH LEAVITT, Senior Judge

## *OPINION NOT REPORTED*

**MEMORANDUM OPINION BY**
**JUDGE DUMAS**                                          **FILED:  March 13, 2026**

Penn Renewables, LLC, (Penn) has petitioned this Court to review the opinion and order (Opinion) issued on February 20, 2025, by the Pennsylvania Public Utility Commission (Commission).   Through this Opinion, the Commission adopted a recommended decision issued by two administrative law judges (ALJs), denied Penn's exceptions thereto, and granted a non-unanimous settlement approval petition (Settlement Petition) that authorized a modified version of UGI Utilities, Inc. – Electric Division's (UGI) proposed default service plan (DSP).  We affirm.

# I. BACKGROUND[1]

UGI is a Commission-regulated public utility that generates electricity and provides electrical service to approximately 62,000 customers in Luzerne and Wyoming Counties. Under the Electricity Generation Customer Choice and Competition Act (Competition Act),[2] UGI is considered both an electric distribution company (EDC)[3] and a default service provider (Provider).[4] Per Section 2807(e)(3.6) of the Competition Act,[5] UGI is required to periodically file and gain approval of DSPs covering the area in which it is the Provider. Such a plan must articulate how UGI will accomplish its Provider-based duties and must include "a strategy for procuring generation supply, a schedule for implementation, and a rate design to recover [its] reasonable costs." Op. at 3.

As for Penn, it "is a solar development company that utilizes solar voltaics and whose business plan is to develop many small scale, distribution level solar arrays throughout the Commonwealth of Pennsylvania." Op. at 24. It "has over 300 solar arrays in development across the Commonwealth, including twelve arrays under development in UGI's service territory." *Id.* Penn qualifies as a

---

[1] We draw the substance of this section from the Commission's Opinion, as well as the Recommended Decision that was issued by the Commission's ALJs. *See generally* Op., 2/20/2025; Recommended Decision, 12/3/24.

[2] 66 Pa.C.S. §§ 2801-2812.

[3] An EDC is defined in the Competition Act as "[t]he public utility providing facilities for the jurisdictional transmission and distribution of electricity to retail customers, except building or facility owners/operators that manage the internal distribution system serving such building or facility and that supply electric power and other related electric power services to occupants of the building or facility." 66 Pa.C.S. § 2803.

[4] A Provider is defined in the Competition Act as "[a]n electric distribution company within its certified service territory or an alternative supplier approved by the commission that provides generation service to retail electric customers who: (1) contract for electric power, including energy and capacity, and the chosen electric generation supplier does not supply the service; or (2) do not choose an alternative electric generation supplier." 66 Pa.C.S. § 2803.

[5] 66 Pa.C.S. §§ 2807(e)(3.6).

2

customer-generator under both Section 2 of the Alternative Energy Portfolio Standards Act (AEPS Act)[6] and the Commission's administrative regulations. As a customer-generator, Penn "participate[s] in a program known as net metering, which is a billing mechanism that allows residential and commercial customers who generate their own electricity from renewable resources to feed excess electricity back into the grid and to be compensated for the excess." Op. at 23 n.6 (citing 52 Pa. Code § 75.12).[7]

Cognizant of the impending expiration of its then-active DSP IV, UGI filed a petition (DSP V Petition) with the Commission on May 31, 2024, through

---

[6] Act of November 30, 2004, P.L. 1672, *as amended*, 73 P.S. § 1648.2. This provision defines "customer-generator" as:

> A nonutility owner or operator of a net metered distributed generation system with a nameplate capacity of not greater than 50 [kW] if installed at a residential service or not larger than 3,000 [kW] at other customer service locations, except for customers whose systems are above three [MW] and up to five [MW] who make their systems available to operate in parallel with the electric utility during grid emergencies as defined by the regional transmission organization or where a microgrid is in place for the primary or secondary purpose of maintaining critical infrastructure, such as homeland security assignments, emergency services facilities, hospitals, traffic signals, wastewater treatment plants or telecommunications facilities, provided that technical rules for operating generators interconnected with facilities of an electric distribution company, electric cooperative or municipal electric system have been promulgated by the Institute of Electrical and Electronic Engineers and the . . . Commission.

73 P.S. § 1648.2; *accord* 52 Pa. Code § 75.1.

[7] "[U]nder Section 5 of the AEPS Act, [73 P.S. § 1648.5,] EDCs are mandated to purchase all excess energy from net-metered customer-generators." *Hommrich v. Com.*, 344 A.3d 121, 132-33 (Pa. Cmwlth. 2025) (*Hommrich II*).

which it sought approval of DSP V.[8]  Penn responded by filing a formal complaint regarding the DSP V Petition with the Commission.  The Commission's ALJs then held an evidentiary hearing on October 1, 2024, in which both Penn and UGI fully participated, as did the Office of Consumer Advocate (OCA) and the Office of Small Business Advocate (OSBA).  During the course of this hearing, the ALJs were informed that OCA, OSBA, and UGI had agreed in principle to file the Settlement Petition, but that Penn was opposed thereto.  The ALJs issued their recommended decision on December 3, 2024, to which Penn responded by filing exceptions;

---

[8]      In its original DSP V [P]etition, UGI submitted that its DSP V establishes the terms and conditions under which [it] will acquire default service supplies, including Alternative Energy Portfolio Standards (AEPS) credits, from June 1, 2025, through May 31, 2029[].  UGI also represented that its DSP V employs a prudent mix of electric supplies (i.e., spot market purchases, short-term contracts, and long-term contracts) obtained through competitive bid solicitation processes (i.e., auctions, requests for proposals and/or bilateral agreements).  Consequently, UGI asserted [its] default service customers will receive adequate and reliable service at the least cost over time.

UGI also represented that through its DSP V Petition [it] will: (1) implement a procurement schedule designed to obtain these supplies at the least cost; (2) issue Requests for Proposals . . . seeking default supply in accordance with the agreements and forms included with its DSP V Petition; (3) adopt a contingency plan that addresses any procurement target shortfalls; (4) recover all incurred default service costs on a full and current basis through a specified default service rate design; (5) adopt revised tariff rules clarifying the application of its Generation Supply Rate (GSR)-1 and GSR-2 default service rate classifications; and (6) continue the retail enhancement programs adopted in its DSP IV.  Finally, UGI explained that it is clarifying its GSR-1 and GSR-2 rate groupings to classify customers according to their supply peak load impact (SPLI).  [UGI] submitted that this approach will better align larger net-metering customer-generators with larger customers that have similar grid impacts.

Op. at 3-4 (cleaned up).

broadly speaking, Penn challenged the recommended decision due to UGI's stated intention to classify customers as GSR-1 and GSR-2 according to each customer's SPLI,[9] rather than each customer's peak demand load, as well as due to how the GSR-2 rate would affect the net metering compensation Penn receives from UGI.[10] Thereafter, on February 20, 2025, the Commission issued its Opinion, through which it granted the Settlement Petition, denied Penn's exceptions, and approved the DSP V Petition (as modified by the Settlement Petition). Penn then petitioned our Court for review of the Commission's Opinion.

---

[9] As explained by the Commission:

> UGI proposed [via DSP V] to determine a customer's SPLI based upon the customer's net demand contribution impact to [UGI's] default service procurement activity, as determined upon the net power flow from, or into, [UGI's] distribution system. UGI stated that customers with a SPLI below 100 kW will be classified as GSR-1 customers, while customers with a SPLI that is greater than or equal to 100 kW will be classified as GSR-2 customers. [UGI] stated that this approach would include reviewing net metering customer-generators based upon their net SPLI. [UGI] added that both a non-residential customer with a peak demand of 100 kW or above, and a non-residential customer-generator with a peak injection into [UGI's] distribution grid of 100 kW or above, will be classified as GSR-2 customers because both have respective SPLIs of 100 kW or above. According to [UGI], this proposal prudently groups large customer-generators with large load customers for default service purposes and avoids disparate impacts on small customers.

Op. at 24 (cleaned up).

[10] The most significant difference between these two classifications is that UGI's "GSR-1 procurement mix includes block and [fixed price full requirements] contracts, while [its] GSR-2 procurements are from the hourly spot market." Op. at 26. In simpler terms, this means that the GSR-1 rate is far less variable than the GSR-2 rate. This also means that the value of any net electricity Penn provides to UGI will be dictated in large part by the ebb and flow of the hourly spot market.

5

## II. DISCUSSION

Penn contests the Commission's Opinion on four bases, which we summarize as follows.[11] First, Penn asserts that the Commission violated the Act by approving UGI's proposed GSR-2 rate, because that rate allegedly fails to satisfy the AEPS Act's requirement that customer-generators be compensated at the full retail value of the net amount of electricity they generate. Second, Penn maintains that the Commission erroneously approved UGI's use of hourly default service rates in contravention of Section 2807 of the Competition Act.[12] Third, Penn argues that GSR-2, as approved by the Commission, unlawfully discriminates against customer-generators, in violation of Section 1304 of the Public Utility Code (Code).[13] Finally, Penn claims that the Commission's approval of both GSR-2 and the related SPLI

---

[11] This Court reviews

> a Commission order . . . to determine whether the Commission's findings of fact are supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38 (Pa. 2006). The standard of review to be applied when reviewing a Commission decision is that the Court should not substitute its judgment for that of the Commission when substantial evidence supports the Commission's decision on a matter within the Commission's expertise. *City of Lancaster (Water) v. Pa. Pub. Util. Comm'n*, 769 A.2d 567 (Pa. Cmwlth. 2001) (citing *Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197, 1201 (Pa. 1997)). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion. *Borough of E. McKeesport v. Special/Temporary Civ. Serv. Comm'n*, 942 A.2d 274, 281 (Pa. Cmwlth. 2008).

*McCloskey v. Pa. Pub. Util. Comm'n*, 127 A.3d 860, 867 (Pa. Cmwlth. 2015) (cleaned up).

[12] 66 Pa.C.S. § 2807.

[13] 66 Pa.C.S. § 1304.

6

criteria was arbitrary, capricious, and contrary to the AEPS Act's goal of encouraging distributed electricity generation.[14] Penn's Br. at 18-28.

### A. Full Retail Value

Penn's first argument is comprised of two subsidiary assertions. First, the Commission does not have legal authority to determine what constitutes full retail value in this context. Second, the GSR-2 rate fails to ensure that customer-generators will be paid for the full retail value of electricity because GSR-2 bases the amount of compensation due upon the wholesale spot market price, rather than what was paid by end consumers. Penn's Br. at 18-20.

We disagree with the first contention. Per Section 5 of the AEPS Act, "[e]xcess generation from net-metered customer-generators shall receive full retail value for all energy produced on an annual basis." 73 P.S. § 1648.5. "Full retail value," the critical phrase in this provision, is not defined in the AEPS Act. *See id.* §§ 1648.2, 1648.5. Notably, however, Section 5 expressly mandates that "[t]he [C]ommission shall develop technical and net metering interconnection rules for customer-generators intending to operate renewable onsite generators in parallel with the electric utility grid," through a "stakeholder process" for developing such rules. *Id.* §§ 1648.5. The General Assembly's lack of clear definitional guidance, coupled with its delegation of broad rulemaking authority to the Commission regarding customer-generators and net metering, means that the Commission has been vested via the AEPS Act with authority to determine what constitutes "full retail value" in this context. *See Marcellus Shale Coal. v. Dep't of Env't Prot.*, 292

---

[14] This is but a restatement of what we have noted in the past, which is that "[t]he purpose of the AEPS Act is to encourage the development of energy generated from renewable and environmentally beneficial sources." *Hommrich v. Pa. Pub. Utilities Comm'n*, 231 A.3d 1027, 1040 (Pa. Cmwlth. 2020) (*Hommrich I*).

A.3d 921, 927-29 (Pa. 2023) (discussing agency authority regarding statutory interpretation, as well as applicable standards of judicial deference). Penn's assertion to the contrary is thus incorrect.

We similarly conclude that the second component of this argument is without merit. The Commission has established via administrative regulation what amounts to a three-step process for determining how to compensate customer-generators. First, a Provider must give a customer-generator credit for any net amount of electricity the customer-generator generated during a billing period, the value of which is calculated using the "full retail kilowatt-hour rate[,] which . . . includes generation, transmission[,] and distribution charges[.]" 52 Pa. Code § 75.13(d). In this context, "generation" is the creation of electricity, while "transmission" means "moving electricity from the generating sources to other areas of a utility's service area," and "distribution" constitutes "delivering electricity to the consumer." *Spectrum Arena Ltd. P'ship v. Com.*, 921 A.2d 585, 586 (Pa. Cmwlth. 2007) (cleaned up). Second, any electricity generated by a customer-generator during a billing period that is in excess of the amount it used during that same period must be carried forward as a credit, the value of which is calculated using the full retail kilowatt-hour rate. *Id.* This credit can be used to offset any subsequent instances in a given year where the customer-generator's electricity usage exceeds the amount it has generated. *Id.* Finally, if any unapplied credit remains at the end of each year, the relevant Provider is required to pay a customer-generator for that credit, with compensation set using the Provider's price-to-compare rate. *See* 52 Pa. Code § 75.13(e).[15] These regulatory provisions offer

---

[15] This "price-to-compare" rate is "[a] line item that appears on a retail customer's monthly bill for default service . . . [that] is equal to the sum of all unbundled generation and transmission related charges to a default service customer for that month of service." 52 Pa. Code § 54.182.

"necessary guidance on net metering, specifically, how excess generation is measured, credited, and compensated at the *full retail rate* on a yearly basis, consistent with the terms of the AEPS Act." *Hommrich II*, 344 A.3d at 139 (emphasis added). In short, the Commission has established that "full retail value," as that phrase is used in Section 5 of the AEPS Act, equates to "full retail rate," as articulated in the Commission's regulations.

In this instance, the record supports the Commission's determination that the GSR-2 rate properly compensates customer-generators for the excess electricity they generate. Per UGI's electrical tariff filing, the GSR-2 rate shall be calculated through a formula that combines several components: the "real-time Locational Marginal Price [*i.e.*, the wholesale electricity price] during each hour of the billing month"; capacity and transmission costs; administrative and legal costs; taxes; various net metering costs; "*and any other applicable costs of providing default service for the GSR-2 group.*" UGI's Electrical Service Tariff, Rider B at 3 (emphasis added). In other words, this rate accounts for costs pertaining to the generation, transmission, *and* distribution of electricity. Furthermore, James Crist, Penn's sole witness who testified regarding this issue during the Commission's proceedings, admitted that UGI was providing retail service to its customers via the GSR-2 rate. Comm'n Hearing Tr., 10/1/24, at 103. Under these circumstances, we cannot conclude that the Commission improperly determined that the GSR-2 rate will compensate Penn for the full retail value of its excess generated electricity.[16]

---

[16] It also bears mentioning that UGI presented testimony from a witness who stated that GSR-2 constitutes a full retail rate. *See* Rebuttal Testimony of Stan C. Faryniarz at 26-27. The Commission did not expressly declare this witness credible in the context of this issue, but the Commission's disposition of Penn's pertinent exception shows that the Commission implicitly did so. *See* Op. at 63-66.

9

*B. Compliance with Section 2807 of the Competition Act*

Next, Penn argues that GSR-2 violates Section 2807 of the Competition Act. Penn claims that this is so because the GSR-2 rate forces small business customers into a real-time pricing scheme without their consent, as well as because this rate purportedly does not comply with Section 2807's mandate that Providers like UGI provide electricity to their customers at a price that reflects the least cost over time. Penn's Br. at 20-22.

These assertions are incorrect for several reasons. First, the requirement that all customers be allowed to choose whether to participate in real-time pricing does not apply to UGI, because it is an EDC with fewer than 100,000 customers. 66 Pa.C.S. § 2807(f)(6); *see* Op. at 2. Second, though Section 2807(e)(7) of the Competition Act bars Providers from changing the rates charged to small business customers more than once per quarter, *see* 66 Pa.C.S. § 2807(e)(7), this provision is inapplicable to the GSR-2 rate. The meaning of "small business customer" is not articulated in the Competition Act, but is defined in the Commission's regulations as "a person, sole proprietorship, partnership, corporation, association or other business entity that receives electric service under a small commercial, small industrial or small business rate classification, and whose maximum registered peak load was less than 25 kW within the last 12 months." 52 Pa. Code § 54.2. As explained in the Commission's Opinion, GSR-2 is a default service rate classification that will apply only to "large commercial and industrial customers with a SPLI of 100 kW or greater." *See* Op. at 26-27, 53-54. Thus, by its own terms, GSR-2 is not a small business rate and cannot be applied to small

10

business customers.[17]   Finally, the Commission found that the GSR-2 rate will provide customers with the least cost over time, by ensuring that price and supply volatility caused by customer-generators with SPLIs over the aforementioned threshold would not impact residential customers and commercial or industrial customers with lesser SPLIs.  *See id.* at 53-54.  That determination is supported by substantial evidence in the record.  *See, e.g.*, Rejoinder Testimony of Stan C. Faryniarz at 10-12.   Thus, GSR-2 fully complies with Section 2807 of the Competition Act.

### C. Unlawful Discrimination

We are similarly unpersuaded by Penn's argument that the GSR-2 rate violates Section 1304 of the Code by unlawfully discriminating against customer-generators.  Penn asserts that the GSR-2 rate improperly distinguishes customers based upon SPLI, thereby "forc[ing customer-generators] to sell their excess energy at a lower rate than other customers must pay for electricity – a structural inequity that non-generating customers do not face."  *See* Penn's Br. at 23-24.  Discriminatory rates are indeed prohibited by the Code, which mandates that "[n]o public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service."  66 Pa.C.S. § 1304; *accord* 52 Pa. Code § 75.13(j).[18]  However, this does not mean that any and all rate differences between

---

[17] We acknowledge the circular nature of the "small business customer" definition used in 52 Pa. Code § 54.2.  This regulation's plain language creates a tautology of sorts, since a customer cannot be a "small business customer" unless it is charged a "small business rate."  52 Pa. Code § 54.2.  However, Penn did not challenge the legal validity of this definition, so we are constrained to deem it proper.

[18]      An EDC and [Provider] shall provide net metering at nondiscriminatory rates identical with respect to rate structure, retail rate components and any monthly charges to the rates charged to other customers that are not customer-generators on the same

**(Footnote continued on next page…)**

11

customer classes are deemed *ipso facto* unlawful, as "[m]ere differences in rates between classes of customers does not establish unreasonable discrimination." *Peoples Nat. Gas Co. v. Pa. Pub. Util. Comm'n*, 409 A.2d 446, 455 (Pa. Cmwlth. 1979); *accord Phila. Suburban Transp. Co. v. Pa. Pub. Util. Comm'n*, 281 A.2d 179, 186 (Pa. Cmwlth. 1971) ("There is no requirement that rates for different class of service must be either uniform or equal or that they must be equally profitable."). Indeed, charging different customer classes different rates "based on such criteria as the quantity of electricity used, the nature of the use, the time of the use, the pattern of the use, or based on differences of conditions of service, or cost of service are not only permissible but often are desirable and even necessary to achieve reasonable efficiency and economy of operation." *Phila. Suburban Transp.*, 281 A.2d at 186. "Before a rate can be declared unduly preferential and therefore unlawful, it is essential that there be not only an advantage to one, but a resulting injury to another." *Phila. Elec. Co. v. Pa. Pub. Util. Comm'n*, 470 A.2d 654, 657 (Pa. Cmwlth. 1984) (quoting *Alpha Portland Cement Co. v. Pub. Serv. Comm'n*, 84 Pa. Super. 255, 272 (1925)). This can take the form of a utility "collecting from one more than a reasonable rate to him in order to make up for inadequate rates charged to another, or [charging] a lower rate to one of two patrons who are competitors in business." *Id.* "Overall, the rate differentials must advance efficient and satisfactory service to the greatest number at the lowest overall charge" and cannot survive scrutiny for discrimination unless there is proof to that effect. *Lloyd v. Pa. Pub. Util. Comm'n*,

---

default service rate. An EDC and [Provider] may use a special load profile for the customer-generator which incorporates the customer-generator's real time generation if the special load profile is approved by the Commission.

52 Pa. Code § 75.13(j).

904 A.2d 1010, 1016 (Pa. Cmwlth. 2006) (quoting *Philadelphia Suburban Water Co. v. Pa. Pub. Util. Comm'n*, 808 A.2d 1044, 1060 (Pa. Cmwlth. 2002)).

The requisite type of evidence is present here. As explained by the Commission, "UGI's proposal avoids rate discrimination against residential and small commercial customers because, without it, these customers will pay higher default service rates caused by and for the benefit of large customer-generators." Op. at 54; *accord* Comm'n's Br. at 6 (explaining that "inclusion of large customer-generators in the GSR-1 procurement group would result in higher electricity prices, rate volatility, and the risk of inadequate supply for residential and small business customers). This determination is supported by the record. *See, e.g.*, Rebuttal Testimony of Stan C. Faryniarz at 12-13, 16-18 (discussing difficulty UGI has had in securing adequate electricity supply and explaining why proposed GSR-1 and GSR-2 rate classification methods are proper); Rejoinder Testimony of Tracy A. Hazenstab at 6-7 (explaining why the proposed rates are proper, nondiscriminatory, and least cost over time).[19] We therefore have no basis to disturb the Commission's determination that GSR-2 constitutes a valid rate that comports with Section 1304 of the Code. *See Phila. Suburban Water*, 808 A.2d at 1060 (noting that "rate-making questions require the exercise of the [Commission's] expertise, and [this Court] tend[s] to defer to the [Commission's] exercise of discretion in this area" with limited exception).

### D. Regulatory Waivers and Public Policy Considerations

Finally, Penn's claim that the Commission's approval of the GSR-2 rate and the SPLI criterion was arbitrary, capricious, and in violation of the AEPS Act's

---

[19] The Commission did not expressly credit each of these witnesses regarding this issue, but nevertheless implicitly did so via its disposition of Penn's pertinent exceptions. *See* Op. at 47-63, 66-68.

goal of fostering distributed generation of electricity is without merit. Penn argues this is so for what amounts to three reasons. First, Penn contends that UGI did not properly request a regulatory waiver through its DSP V Petition regarding its proposed usage of both the 100 kW threshold and the SPLI mechanism. Second, Penn maintains that the Commission improperly granted the waiver, because it was the ALJs' duty to do so, as well as because the decision to grant the waiver was not supported by any record evidence. Third, Penn alleges that the GSR-2 rate will not compensate customer-generators for the full retail value of the net electricity they generate and, thus, violates the AEPS Act by contravening the General Assembly's intention of fostering the proliferation of distributed electricity generation. Penn's Br. at 26-28.

Each of these positions is unsupported by the law, the facts, or both. Penn's assertion regarding the regulatory waiver is belied by the record, which shows that UGI did request that waiver through its DSP V Petition; specifically, UGI asked the Commission to waive certain regulations that would otherwise prevent UGI from classifying its customers using the aforementioned 100 kW threshold and SPLI mechanism. *See* DSP V Pet., ¶¶93-95.[20] It is immaterial that the ALJs did not

---

[20] These portions of UGI's DSP V Petition read as follows:

> 93. UGI . . . recognizes the Commission's default service regulations and policy statement intend that DSPs be tailored to acquire default supplies for specific customer groupings with maximum registered peak loads of: 1) less than 25 kW for residential and non-residential customers; 2) between 25 kW and 500 kW for nonresidential customers; and 3) greater than 500 kW for certain non-residential customers (*i.e.*, commercial and industrial customers). 52 Pa. Code §§ 54.187(i)-(k) and 69.1805.

> 94. However, the regulations and policy statement also provide that DSPs may propose alternative divisions of customers.

**(Footnote continued on next page…)**

95. As noted above, UGI . . . proposes in this [p]etition to continue to acquire default service supplies for two groups – all customers with supply peak load impacts less than 100 kW, and customers with supply peak load impacts of 100 kW or greater, and, to the extent necessary, requests a waiver from the customer groupings recommended in 52 Pa. Code §§ 54.187 and 69.1805 to permit this procurement strategy to continue.

DSP V Pet., ¶¶93-95. The regulatory provisions mentioned in these portions of UGI's DSP V Petition provide:

(i) Default service rates shall be adjusted on a quarterly basis, or more frequently, for all customer classes with a maximum registered peak load of 25 kW to 500 kW, to ensure the recovery of costs reasonably incurred in acquiring electricity at the least cost to customers over time. [Default service providers] may propose alternative divisions of customers by maximum registered peak load to preserve existing customer classes.

(j) Default service rates shall be adjusted on a monthly basis, or more frequently, for all customer classes with a registered peak load of equal to or greater than 500 kW to ensure the recovery of costs reasonably incurred in acquiring electricity at the least cost to customers over time. [Default service providers] may propose alternative divisions of customers by registered peak load to preserve existing customer classes.

(k) When a supplier fails to deliver electric generation supply to a [default service provider], the [default service provider] shall be responsible for acquiring replacement electric generation supply consistent with its Commission-approved contingency plan. When necessary to procure electric generation supply before the implementation of a contingency plan, a [default service provider] shall acquire supply at the least cost to customers over time and fully recover all reasonable costs associated with this activity that are not otherwise recovered through its contract terms with the default supplier. The [default service provider] shall follow acquisition strategies that reflect the incurrence of reasonable costs, consistent with 66 Pa.C.S. § 2807, when selecting from the various options available in these energy markets.

52 Pa. Code § 54.187(i)-(k).

**(Footnote continued on next page…)**

A proposed procurement plan should balance the goals of allowing the development of a competitive retail supply market and also including a prudent mix of arrangements to minimize the risk of over-reliance on any energy products at a particular point in time. In developing a proposed procurement plan, a [default service provider] should consider including a prudent mix of supply-side and demand-side resources such as long-term, short-term, staggered-term and spot market purchases to minimize the risk of contracting for supply at times of peak prices. Short-term contracts are contracts up to and including 4 years in length. Long-term contracts are contracts more than 4 years in length but not more than 20 years. Long-term contracts of more than 4 years in length but not more than 20 years should not constitute more than 25% of the [default service provider's] projected load unless the Commission determines that a greater portion of load is necessary to achieve least cost procurement. The plan should be tailored to the following customer groupings, but [default service providers] may propose alternative divisions of customers by registered peak load to preserve existing customer classes.

(1) *Residential customers and nonresidential customers with less than 25 kW in maximum registered peak load.* Initially, the [default service provider] should acquire electric generation supply for these customers using a prudent mix of resources as described in the introductory paragraph to this section. Contracts should be laddered to minimize risk, in which a portion of the portfolio changes at least annually, with a minimum of two competitive bid solicitations a year to further reduce the risk of acquisition at a time of peak prices. In subsequent programs, the mix percentage of supply acquired through long-term and short-term contracts and spot market purchases should be adjusted, depending on developments in retail and wholesale energy markets to ensure least cost to customers.

(2) *Nonresidential customers with 25-500 kW in maximum registered peak load.* The [default service provider] should acquire electric generation supply for these customers using a mix of resources as described in the introductory paragraph to this section. Fixed-term contracts may be laddered to minimize risk, with a minimum of two competitive bid solicitations a year to further reduce the risk of acquisition at

**(Footnote continued on next page…)**

grant this waiver, because it is beyond cavil that "[t]he Commission, not the ALJ, is the ultimate factfinder in proceedings before it and must resolve conflicts in testimony as well as weigh the evidence presented." *PPL Elec. Utilities Corp. v. Pa. Pub. Util. Comm'n*, 912 A.2d 386, 399 n.11 (Pa. Cmwlth. 2006). Furthermore, the Commission specifically found that UGI had established that the 100 kW SPLI threshold was the proper differentiation point for determining whether a customer would receive the GSR-1 rate or the GSR-2 rate. Op. at 53-54; *see also id.* at 26-27 (providing a summary of UGI's pertinent arguments). The Commission specifically held that doing otherwise, and thereby grouping customer-generators with SPLIs in excess of that amount with customers that had lesser SPLIs, would cause GSR-1 customers to both pay more and have a less stable supply of electricity. *See id.* at 53-54. Each of these determinations is supported by substantial evidence. *See, e.g.,* Rebuttal Testimony of Stan C. Faryniarz at 16-21; Rejoinder Testimony of Stan C. Faryniarz at 9-12. Finally, as we have already explained, *supra*, the record supports the Commission's determination that the GSR-2 rate will compensate customer-generators for the full retail value of their net generated electricity. The GSR-2 rate therefore comports with the purpose of the AEPS Act. As such, Penn's final

---

a time of peak prices. In subsequent programs, the mix percentage of supply acquired through long-term and short-term contracts and spot market purchases should be adjusted, depending on developments in retail and wholesale energy markets to ensure least cost to customers.

(3) *Nonresidential customers with greater than 500 kW in maximum registered peak load.* Hourly priced or monthly-priced service should be available to these customers. The [default service provider] may propose a fixed-price option for the Commission's consideration.

52 Pa. Code § 69.1805 (emphasis in original).

17

argument does not provide us with a valid basis for disturbing the Commission's disposition of UGI's DSP V Petition.

### III. CONCLUSION

In accordance with the foregoing analysis, we affirm the Commission's Opinion.

<br>
<br>

_____
**LORI A. DUMAS, Judge**

Judge Fizzano Cannon did not participate in this decision.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Penn Renewables, LLC,                      :
                      Petitioner                :
                                      :   No. 337 C.D. 2025
               v.                                     :
                                        :
Pennsylvania Public Utility              :
Commission,                                 :
                    Respondent              :

# **O R D E R**

AND NOW, this 13th day of March, 2026, it is hereby ORDERED that the Pennsylvania Public Utility Commission's February 20, 2025 opinion and order is AFFIRMED.

 

 

                                                       **LORI A. DUMAS, Judge**